421 So.2d 1244 (1982)
Billy Herman HALL, et al.
v.
The CITY OF TUSCALOOSA, et al.
81-94.
Supreme Court of Alabama.
September 17, 1982.
Rehearing Denied November 5, 1982.
*1245 William J. Donald and William J. Donald, III of Zeanah, Donald & Hust, Tuscaloosa, for appellants.
J. Wagner Finnell, City Atty., and Robert W. Ennis, IV, Asst. City Atty., City of Tuscaloosa Legal Dept., Tuscaloosa, for appellees.
JONES, Justice.
This action was instituted by certain civil service employees of the City of Tuscaloosa, all members of the Tuscaloosa Fire Department, and by Local 403 of the International Association of Firefighters, seeking both injunctive and declaratory relief against the City of Tuscaloosa, its Civil Service Board, and others. From a judgment denying all relief sought, Appellants bring this appeal.
The Air Crash Station at the Tuscaloosa Municipal Airport exists as the result of years of gradual development. Initially, the Station was manned by police officers, and later by employees of Dixie Air, Inc., in conjunction with the police officers. The next refinement in the Station's service was the dispatching of a fire truck from a station of the Tuscaloosa Fire Department to "stand by" before the landing and until the departure of a commercial aircraft. Government grants enabled the City to purchase specially-equipped air crash trucks and to construct a permanent station at the airport to house both the equipment and the air crash personnel. At that time, employees of the Tuscaloosa Fire Department manned the Station as any other Fire Department station: three shifts of firemen who kept normal shift schedules of 24 hours on duty and 48 hours off duty. Federal Aviation Administration regulations require that an air crash station's equipment and personnel be available immediately before, during, and after the arrival and departure of a commercial aircraft.
When the City of Tuscaloosa's expenditures began to exceed its revenues, City officials investigated methods of operating more efficiently and effectively. It was determined that the Air Crash Station was manned 24 hours a day, and that, the number of commercial flights arriving and departing notwithstanding, the City was obligated to pay the salaries for the firemen at the Station for the entire 24-hour shift schedule periods. Additionally, the City learned that other large metropolitan airports were utilizing air crash stations manned by specially trained personnel, not employed by the city's fire department, whose work hours were tailored to the airline schedules.
A financial study, prepared by the City's Personnel Office, projected the cost of manning the Air Crash Station for one year with Fire Department personnel on the Fire Department schedule as $184,056.90. The same study indicated a projected total cost for manning the Station for one year with personnel on a more flexible "as needed"[1] basis of $109,818.67.
In March of 1980, the City's Commission Board adopted a resolution authorizing the planning of a separate Air Crash Station.
*1246 In May of 1980 the Commission Board adopted Ordinance No. 2129, which states:
"WHEREAS, a study has been made to determine the feasibility of establishing a separate Air Crash Station at the Tuscaloosa Municipal Airport to meet the City's obligation of manning the station only during those periods immediately preceding and during the time of regularly scheduled commercial aircraft arrivals and takeoffs at the Airport; and
"WHEREAS, in the opinion of the Board, the requirements for manning the Air Crash Station and for serving the public using the Municipal Airport can be best served, and more economically served, by the establishment of a separate Air Crash Station or department not controlled through the Tuscaloosa Fire Department, but operated under the direct supervision and control of a separate Air Crash Chief or Department Head in conjunction with and in coordination with the Airport Manager and the Federal Aviation Administration.
"NOW, THEREFORE, BE IT ORDAINED BY THE COMMISSION BOARD OF TUSCALOOSA, as follows:
"1. That, in order to provide for the safety of persons using the Tuscaloosa Municipal Airport, through commercial and other flights into and out of the Tuscaloosa Municipal Airport, there is hereby created a separate department to be called the `Tuscaloosa Air Crash Station.'
"2. Said Air Crash Station shall be manned by six (6) municipal employees, who shall be employed and paid as hourly employees, and by one (1) Air Crash Chief or Department Head.
"3. The six (6) hourly employees shall be paid bi-weekly as other hourly employees are paid, and the initial hourly compensation authorized shall be Five and 21/100 Dollars ($5.21) per hour.
"4. The Department Head or Chief, Air Crash Station, shall be paid bi-weekly as other salaried employees are paid, with an initial salary of Seven Hundred Twenty-seven and 60/100 Dollars ($727.60) biweekly. The Chief or Head of the Air Crash Station, being a salaried employee, shall be selected and employed in accordance with the applicable Civil Service laws and Rules of the Civil Service Board, governing the selection of municipal employees subject to such system.

"5. All personnel performing such duties at the Air Crash Station shall first receive, or shall have received, training which meets the minimum requirements for firefighters in the State of Alabama and, thereafter, shall be further instructed in air crash procedures and techniques." (Emphasis supplied.)
The members of the Tuscaloosa Fire Department are hired and maintained under the City's Civil Service System, pursuant to Act No. 249 of the Local Acts of the State of Alabama (1947), which provides, in part:
"Section 2. Definitions.  As used in this Act, unless the context plainly indicates a different meaning, the following words, terms and phrases shall have the meanings respectively ascribed to them:... `employee' means any person (including the head of departments) who is employed in the service of the city on a regular monthly salary, with the exception of elected officers, the municipal recorder or judge, school teachers and all other employees of the city board of education, the administrator and all other employees of any city owned or operated hospital, and the director of recreation and all employees of the city recreation board; ...
"Section 3. Civil Service System.  All employees of the city as herein defined shall be subject to civil service rules and regulations prescribed in this Act or promulgated pursuant to Section 8 hereof and administered by the civil service board, the creation of which is provided for in Section 4 hereof...."
The Ordinance, as noted earlier, authorized the use of specially trained hourly employees at the separate Air Crash Station  employees not coming within the jurisdiction of the Civil Service Board.
*1247 A complaint, seeking injunctive relief, was filed by members of the Tuscaloosa Fire Department (all civil service employees) and by Local 403 of the International Association of Firefighters. Defendants were the City of Tuscaloosa, the Chairman of the Commission Board, the Public Safety Commissioner, Associate Members of the Commission Board, and the Tuscaloosa Civil Service Board and its members. Plaintiffs claimed bad faith in the adoption of Ordinance 2129, because the creation of the separate Air Crash Station and the hiring of "hourly" personnel allegedly violated the "spirit, intent, and express provisions and meanings" of the civil service law, and were contrary to law. Further, Plaintiffs alleged that the actions of Defendants would lead to the creation of an independent fire department, immune from both the requirements and the safeguards of the civil service system. Plaintiffs also contended that they suffered injury in the threat posed to their job security, because:
"[d]ue to the ordinance [No. 2129], jobs that formerly existed within the Civil Service System were abolished when non civil service firefighters were assigned to the Air Crash Station to do the identical work previously done by civil service firemen. The result, in effect, has been an abolishment of jobs and an immediate creation and staffing of non civil service jobs as to the identical work."
In addition to an injunction prohibiting the implementation of Ordinance 2129, Plaintiffs requested an order voiding the ordinance and requiring the Air Crash Station to be manned by regular civil service firemen.
After a non-jury trial, the trial judge entered judgment for all Defendants and against all Plaintiffs, finding no bad faith in the adoption of Ordinance 2129, and specifically holding:
"On the contrary, the Court finds that the adoption of the ordinance was an attempt to effect savings of tax dollars and to provide better service to the public. Whether or not this ordinance has met these purposes, this Court does not express an opinion. Suffice it to say that the actions of the City were not in `bad faith, fraudulent, arbitrary, unreasonable, or a palpable abuse of discretion.'"
We disagree; and we reverse and remand.
It is, without question, a settled rule of law in Alabama that:
"municipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable." Cudd v. City of Homewood, 284 Ala. 268, 270, 224 So.2d 625 (1969).
It is equally well-settled that:
"courts will not inquire into the motives which may have induced authorized legislative action, whether by the Legislature of the state or by the municipal council.
". . .
"This, it will be observed, is but an elaboration of the rule that bad faith must be apparent upon the face of the act, and cannot be shown by extrinsic fact." Clements v. Commission of City of Birmingham, 215 Ala. 59, 61, 109 So. 158 (1926).
The case of Miller v. State, 249 Ala. 14, 29 So.2d 411 (1947), relied upon and cited to us by Appellants, is a good example of that "apparent upon the face of the act" requisite discussed in Clements, supra. In Miller, a civil service position was destroyed and a non-civil service position created in a single ordinance without accompanying indications of prior study of possible reasons for the ordinance. The Miller court specifically stated:
"In the instant case, we have not only contemporaneous action, but all the evidences of bad faith wrapped up in the same resolution.... A mere reading of the ordinances and resolutions in this case convinces us of their obvious purpose to evade superior laws, which is what this Court has said constitutes bad faith in their enactment." Miller, at 249 Ala. 23, 29 So.2d 411.
*1248 Turning to the facts now before us, we acknowledge the City's valid concern for insuring the proper use of its resources so as to best serve the citizenry of Tuscaloosa. Further, we commend the City officials for a thorough study of the factors involved in staffing and equipping the Air Crash Station. We can not, however, extend the presumption of validity to Ordinance 2129.
In the case of City of Wichita Falls v. Harris, 532 S.W.2d 653 (Tex.Civ.App.1975), the Texas court was faced with a situation very similar to the facts of the instant appeal:
"The City contends that it could not fill the Civil Service position described as `Fire Training Officer' by Civil Service examination. It then created and filled a non-Civil Service position described as `Fire Training Specialist' to take the place of the Fire Training Officer position. It contends that this act was not void.
". . .
"Thereafter, by memorandum written by the City Manager of the City, there was created a classification of Fire Training Specialist in the Fire Department and it was noted that such position was abolished and a non-Civil Service position was created to take its place. The present occupant of that position was employed without an examination. Thereafter, the Board of Aldermen passed an ordinance purporting to abolish the Civil Service classification and created the non-Civil Service classification.
"The job description of both positions requires that a person holding the position must have knowledge of the principles and practices of fire prevention and suppression.
"The Fire Training Specialist is paid by the Fire Department, drives a Fire Department vehicle, attends fires, has an office in the fire station, and the Fire Chief is his supervisor. He attends the City's rookie fire school and he is responsible for organization and implementing the tactical attack on fires when they break out." City of Wichita Falls, at 532 S.W.2d 656, 657.
Despite the City's assertion that it could not fill the Civil Service position of Fire Training Officer because of the hurdle of the requisite Civil Service examination, the Texas court found that the non-Civil Service job classification was almost identical to the prior Civil Service job classification, and declared the ordinance void. The court then quoted from the case of City of San Antonio v. Wallace, 161 Tex. 41, 338 S.W.2d 153 (1960), wherein it was held that the presumption of validity and regularity as applied in the construction of official acts, should not be applied to the construction of civil service ordinances. The logic of the City of San Antonio court's holding is evident:
"Should we close the doors against a judicial inquiry into the element of good faith in municipal action, a colorable or sham ordinance could render an express constitutional provision impotent and meaningless.[2]
The policy of the state, as reflected in its civil service statutes, would be at the mercy of municipal action. In this situation, the courts in carrying out state policy must consider the element of good faith in passing upon the validity of municipal actions.
". . .
"The authorities however do support the proposition that an action of a city legislative body abolishing civil service positions may be judicially examined in the light of its surrounding circumstances, the prior and subsequent actions of such legislative body and the public policy represented by the civil service law in order to determine the good faith of the questioned action." City of San Antonio, at 338 S.W.2d 156.
The public policy of the State of Alabama was enunciated by its legislature in the *1249 enactment of Act No. 249 (1947). The purpose of that legislation was:
"[t]o provide for the City of Tuscaloosa a civil service system governing the appointment, removal, salaries, tenure, and official conduct of employees of the city, defining violations of the Act, and imposing penalties for violations."
The various civil service systems of this State were created by the Legislature to achieve the goals of stability, continuity, and security in the various job classifications within a municipality. Efficiency, safety, and economy reasons notwithstanding, the City's attempts to subvert and evade the requirements and employee-protections of the Civil Service Act by hiring non-Civil Service "hourly" employees who are, in all respects, identical to their Civil Service counterparts, are tantamount to bad faith. The goals which the various civil service acts seek to achieve may not be circumvented by acts such as Ordinance 2129, and this Court will carefully scrutinize attempts at such evasion. Such scrutiny, in the instant case, reveals to us that while the "face" of Ordinance 2129 reflects a valid concern for the continuation of a vital service of the municipality, the "surrounding circumstances" and the "public policy represented by the civil service law" reveal an attempt to avoid the demands of Act. No. 249 (1947)  the ultimate protection afforded the employees of the City of Tuscaloosa.
Although we have analyzed and discussed this problem within the good faith/bad faith dichotomy context, we recognize that from a purely technical point of view these terms are inaccurate as applied in the instant case. While the Miller Court explicitly equated the enactment of an ordinance that "evade[s] superior law" with "bad faith ... enactment," and while we retain that vernacular in our rationale for the instant holding, for accuracy's sake it ought to be pointed out that the good faith/bad faith dichotomy has its field of operation in testing reasonableness v. arbitrariness. On the other hand, a municipal ordinance that contravenes state law, as here, is invalid for that reason alone; and the application of the good faith/bad faith test is superfluous.
We hold, then, that Ordinance 2129, as enacted by the City of Tuscaloosa, is void, and we reverse the judgment and remand this cause for further proceedings in accordance with this opinion.
REVERSED AND REMANDED.
FAULKNER, EMBRY and ADAMS, JJ., concur.
SHORES, J., concurs in the result.
BEATTY, J., concurs specially.
TORBERT, C.J., dissents.
MADDOX and ALMON, JJ., not sitting.
BEATTY, Justice (concurring specially):
According to the court's opinion, the purpose of civil service legislation is "to achieve the goals of stability, continuity and security in the various job classifications within a municipality." This formulation is overbroad and, if applied literally, would unduly restrict the power of municipalities to reorganize personnel for reasons of economy. The actual statutory purpose of such legislation is a narrower one: to limit political control and arbitrary discretion in public employment, making it easier to attract and retain employees on the basis of merit. See Miller v. State ex rel. Peek, 249 Ala. 14, 29 So.2d 411, 417 (1947). See generally, 3 McQuillen, The Law of Municipal Corporations, §§ 12.76, 12.111, 12.120 (3d ed. 1982). The City of Tuscaloosa's action in no way frustrates this purpose, since the city has demonstrated, as the court recognizes, an economic justification. "Civil service acts... are not intended to retain in office at public expense those whose services may be dispensed with for economy." Id., § 12.111 at 432. Accord Miller v. State, supra.
However, even though in this instance the city acted in good faith to achieve a legitimate goal, the means it chose were not authorized by the civil service laws. The city's action amounts to the creation of a new civil service classification. Only the legislature and not this court may authorize such an action.
*1250 This decision should be viewed as a narrow one; it does not foreclose consideration of whether other municipal actions similarly "legislate" new civil service classifications. See Moncrief v. State, 593 S.W.2d 312 (Tex. 1980) (no bad faith where city saved money by replacing civil service custodians with independent contractor), Annot. 87 A.L. R.2d 1165 (1978), 4 McQuillen, supra, §§ 12.246-12.248d.
TORBERT, Chief Justice (dissenting).
I dissent. The majority opinion refers to the settled rule of law in Alabama that:
"[M]unicipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable. City of Mobile v. La Clede Hotel Co., 221 Ala. 531, 129 So. 477."
Cudd v. City of Homewood, 284 Ala. 268, 270, 224 So.2d 625 (1969). The majority also quotes Clements v. Commission of City of Birmingham, 215 Ala. 59, 61, 109 So. 158 (1926), when it says that bad faith must be apparent upon the face of the act. I am in complete agreement with these principles of law. However, I disagree with the majority's reliance on Miller v. State, 249 Ala. 14, 29 So.2d 411 (1947), as dispositive in this appeal. The ordinance in this case differs in two ways from the ordinance in Miller, in which the bad faith was apparent on the face of the act.
First, a civil service position was not destroyed in the present case. Rather, a job assignment was changed. Appellants remained in the civil service as firefighters with the Tuscaloosa Fire Department. Hourly non-civil service personnel were then hired to man the Air Crash Station. Appellants admitted that they viewed their positions at the Air Crash Station as job assignments and not civil service offices. Appellee was correct in its distinction between the two when it argued in brief:
"A Civil Service `office' is a position created by the Civil Service Board to which employees are assigned who meet the criteria. A `job assignment' is a task which an employee's superior may administratively designate him to perform."
The majority relies upon City of Wichita Falls v. Harris, 532 S.W.2d 653 (Tex.Civ. App.1975), and City of San Antonio v. Wallace, 161 Tex. 41, 338 S.W.2d 153 (1960), in addition to Miller, to hold the ordinance invalid; however, those cases, like Miller, involved the abolition of a job, with which we are not faced, and are, therefore, not analogous to the present case. Second, the ordinance before us was preceded by a feasibility study which the ordinance recognized in its preamble. The study projected annual savings amounting to $75,238.28. The actual savings in the first year under the ordinance were about $74,000.00.
By quoting the public policy represented by the civil service law enunciated in Act No. 249 (1947), the majority addresses the issue of whether the city can justify hiring an employee who is not to be subject to civil service. It is clear from Section 2 of the act that "`employee' means any person who is employed in the service of the city on a regular monthly salary." This explicitly allows hourly personnel to remain outside civil service by including only monthly salaried employees under the civil service law. Obviously, a civil service position could not be abolished and then replaced by an identical non-civil service position, but, as already discussed, that did not occur in this case.
The trial court had Ordinance No. 2129 before it and heard evidence and testimony presented during the trial. Its conclusion that the ordinance was not invalid, either through bad faith, an abuse of discretion, or having been adopted arbitrarily or capriciously, should be sustained.
NOTES
[1] "As needed" to meet the F.A.A. requirements noted above.
[2] The "constitutional provision" with which the Texas court was dealing is comparable to Act No. 249 (1947) and Code 1975, § 11-45-1.