[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 97 
This case is before us on certification of certain unresolved questions of Alabama law by the United States Court of Appeals for the Eleventh Circuit. The questions certified to us all concern an ambiguity in the statutory scheme codified atAla. Code (1975), § 8-21-1 through -14, and entitled "Repurchase of Inventory from Farm Equipment Retailers." In essence, the statute is designed to supersede any contractual terms between farm equipment manufacturers or distributors and their retailers regarding the repurchase of farm equipment inventories at the termination of their dealership or franchise agreements. Among these protections is a repurchase pricing structure, see Ala. Code (1975), § 8-21-3, which is apparently more favorable to retailers than the terms they would normally obtain under their dealership agreements.
The following facts were set forth by the Court of Appeals for our consideration in answering the questions certified to us:
 "From 1979 to 1985, Cahaba Tractor Company was a 'Consumer Products Dealer' for John Deere Company. Under the terms of the contract, John Deere gave Cahaba a one-year notice of its termination as a dealer in October of 1984, with the termination to be effective October 31, 1985. Appellant John Deere brought the present action, seeking a declaration of its rights and obligations with respect to the repurchase of Cahaba's inventory upon termination of the dealership. The district court concluded that Cahaba was a retailer of farm equipment and that Deere was therefore obligated to repurchase Cahaba's inventory under Ala. Code [(1975)], § 8-21-1 et seq. (1984 [Supp.]).
 "John Deere has three classifications of dealers: (1) industrial equipment dealers which primarily sell large earth moving equipment and wood harvesting products, (2) agricultural equipment dealers which sell tractors, planters, tillage and harvesting equipment, and (3) consumer products dealers. As a consumer products dealer, Cahaba was authorized to *Page 98 
sell all John Deere products in the John Deere consumer product price list. This list includes utility and compact tractors, running from 14 to 60 horsepower. Accordingly, Cahaba was authorized to sell four models of utility tractors that were also sold by John Deere Agricultural Dealers. Five such tractors were in Cahaba's inventory at the time the dealership was terminated. Cahaba sold Japanese made John Deere diesel tractors starting at 14 1/2 horsepower. Cahaba also sold compact utility tractors ranging from 20 to 40 horsepower. Fifteen of these tractors were in Cahaba's inventory at the termination of the dealership. Thus, the various John Deere tractors sold by Cahaba ranged in suitability from heavy to light farming capability. Cahaba did in fact sell several tractors to farmers.
 "Cahaba maintained a service department for John Deere equipment. This department worked on utility tractors from 60 to 14 1/2 horsepower, and the attachments for the tractors, such as back hoes and loaders. Cahaba kept an inventory of John Deere parts for this operation, including utility tractor, skid steer, industrial tractor and back hoe parts. At termination, Cahaba had a parts inventory of $70,000 to $75,000.
 "In addition to John Deere equipment, Cahaba also sold Ford and Kubota tractors. In 1984, Cahaba sold approximately 200 tractors from these three manufacturers."
John Deere Co. v. Gamble, 818 F.2d 769, 770 (11th Cir. 1987).
The ambiguity at the center of this dispute is found in the statutory definition of a farm equipment "retailer." That definition reads in pertinent part as follows:
 "RETAILER. Any person, firm or corporation engaged in the business of selling and retailing farm implements, machinery, utility and industrial equipment, attachments or repair parts; but this term . . . shall not include retailers of yard and garden equipment not primarily engaged in the farm equipment business."
Ala. Code (1975), § 8-21-1(5).
It is undisputed that Cahaba Tractor is what might be termed a "mixed dealership" as contemplated under the statute. The company sold, or was authorized to sell, equipment that was designed exclusively for yard and garden use; it also sold equipment that was designed exclusively for farm use; and, as reflected in the statement of facts provided by the United States Court of Appeals, it also sold equipment designed for either farm use or for yard and garden use. Consequently, Cahaba Tractor is certainly a "retailer of yard and garden equipment" under § 8-21-1(5). The primary question with which we are presented, however, is whether Cahaba Tractor is also a "retailer of yard and garden equipment not
primarily engaged in the farm equipment business," id.
(emphasis added), so as to be excluded from the inventory repurchasing scheme set forth in the statute. More precisely, the primary issue facing us is what test or standard was intended by the legislature to establish when a mixed dealership is nevertheless "primarily" a farm equipment retailer so as to bring that retailer within the scope of the statute.
The parties have advanced two opposing tests as to when a retailer is to be considered "primarily" a farm equipment retailer. Cahaba Tractor argues that the "actual sales" test is the appropriate standard. Under this test, the actual sales history of a dealership is to be assessed. If the dollar amount of farm equipment sales exceeds the dollar amount of yard and garden equipment sales over a certain period, then the dealership is to be considered a "farm equipment" retailer and may therefore invoke the provisions of the statute. On the other hand, John Deere argues that the "authorized product line" test is the appropriate standard. This test focuses on the complete spectrum of products that a retailer is authorized to sell under a dealership agreement. Under this test, each product in the line is considered to be of equal weight in determining the nature of the dealership. Under this test *Page 99 
the number of all such products, either "farm equipment" or "yard and garden" equipment, is to be totalled and a comparison made. If the total number of yard and garden products exceeds the total number of farm products, then the retailer is to be considered a yard and garden equipment retailer "not primarily engaged in the farm equipment business" and therefore may not invoke the provisions of the statute.
Considering these and related arguments and the statutory ambiguity as to the proper test to resolve these issues, the United States Court of Appeals has certified the following questions to us:
 "1. Under Ala. Code §§ 8-21-1 et seq., is the statutory definition of 'retailer,' insofar as its excludes 'retailers of yard and garden equipment not primarily engaged in the farm equipment business,' to be applied (1) by reference to a dealer's authorized product line (i.e. what the dealer offers for sale), (2) by reference to the dealer's actual sales results (i.e. what customers in fact purchase from the dealer), or (3) by reference to both product line and actual sales?
 "2. If actual sales are to be considered in determining whether a dealer is a 'retailer' under Ala. Code §§ 8-21-1 et seq., is the actual sales standard to be applied by reference to the percentage of actual gross sales revenues attributable to farm equipment, the percentage of actual net profits attributable to farm equipment, the number of farm equipment items sold versus the number of other items sold, or by reference to some other basis?
 "3. If actual sales are to be considered in determining whether a dealer is a 'retailer' under Ala. Code §§ 8-21-1 et seq., is the determination to be made by reference to actual sales over the life of the dealership, the last year of the dealership or by reference to some other period of time?
 "4. If actual sales are to be considered in determining whether a dealer is a 'retailer' under Ala. Code §§ 8-21-1 et seq., is equipment that is suitable either for yard and garden applications or for light farming applications deemed to be 'farm equipment' or 'yard and garden equipment' __________ under __________ Ala. Code. § 8-21-1(5)?
 "5. In determining whether a dealer is a 'retailer' of farm equipment, should the fact finder be restricted to considering the relationship of the dealer/terminating manufacturer or may the fact finder consider the dealer's sale of farm equipment produced by other manufacturers?"
John Deere Co. v. Gamble, 818 F.2d at 770-71.
As with such certified questions generally, the Court of Appeals also noted that "[t]he phrasing employed in the above certified questions is intended as a guide and is not meant to restrict the Alabama Supreme Court's consideration of the issues in its analysis of the record certified in this case."Id. at 771.
 I. Answers to Certified Questions A. Question One
Most of the issues in this case may be resolved by a careful consideration of the first question certified to us by the Court of Appeals. As might be indicated by our previous discussion, however, we do not regard the basic issue implicated by this question as narrowly as do the parties in this case. We cannot view this question as presenting us solely with the stark choice between an "authorized product line" standard or an "actual sales" standard, but as essentially presenting us with the issue of what standardgenerally was intended by the legislature in adoptingAla. Code (1975), § 8-21-1(5). We will therefore rephrase it accordingly, as was contemplated by the Court of Appeals in its certification of these questions to us.
Certain rules of statutory construction will guide us in deciding this case:
 "The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Advertiser Co. v. Hobbie, 474 So.2d 93
(Ala. 1985); League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). If possible, *Page 100 
the intent of the legislature should be gathered from the language of the statute itself. Advertiser Co. v. Hobbie, supra; Morgan County Board of Education v. Alabama Public School College Authority, 362 So.2d 850 (Ala. 1978). If the statute is ambiguous or uncertain, the court may consider conditions which might arise under the provisions of the statute and examine results that will flow from giving the language in question one particular meaning rather than another. Studdard v. South Central Bell Telephone Co., 356 So.2d 139 (Ala. 1978); League of Women Voters v. Renfro, supra."
Clark v. Houston County Comm'n, 507 So.2d 902, 903-04
(Ala. 1987). In deciding between alternative meanings to be given to an ambiguous or uncertain statutory provision, we will not only consider the results that flow from assigning one meaning over another, but will also presume that the legislature intended a rational result, see State v.Calumet Hecla Consol. Copper Co., 259 Ala. 225,66 So.2d 726 (1953); Crowley v. Bass, 445 So.2d 902 (Ala. 1984) (dictum); 2A N. Singer, Sutherland StatutoryConstruction § 45.12 (Sands 4th ed. 1984), one that advances the legislative purpose in adopting the legislation, see Mobile County Republican Executive Committee v.Mandeville, 363 So.2d 754 (Ala. 1978), that is "workable and fair," State v. Calumet Hecla Consol. Copper Co.,supra; Ex parte Hayes, 405 So.2d 366 (Ala. 1981), and that is consistent with related statutory provisions, see Tatev. Teague, 431 So.2d 1222 (Ala. 1983) (" 'The intention of the Legislature may be determined by examining the statute as a whole' ") (quoting and adopting the trial court's conclusions of law).
This brings us to the central issue in this case: when is a mixed dealership to be considered "primarily engaged in the farm equipment business" under the statute? We hold that the legislature intended the value of inventory actuallypurchased by the retailer to be determinative of this question, not a retailer's "actual sales" nor its "authorized product line."
We reach this conclusion for two overarching reasons. First, applying the authorities on statutory construction noted above, we think that the value of inventory actually purchased by a retailer, used as a measure of the business quality of a mixed dealership, accords with a rational vision of the legislative intent. Second, the two tests advanced by the parties in this case are so internally inconsistent or impractical as to render them unreasonable, and, consequently, neither can be considered to be the intent of the legislature, especially when compared with the inventory-based standard, discussed below.
The "value of inventory" test certainly accords with the language and purpose of the statute considered as a whole. An examination of the specific provision in question in the context of the entire statute reveals the statute's purpose — the statutory scheme was designed to provide a certain class of retailers with certain protections regardinginventory they have previously purchased from manufacturers and distributors, protections likely to be more favorable than would normally be provided under their dealership or franchise agreements. One of the primary focuses of the statute, therefore, is on a retailer'sinventory. We think that similar concentration on inventory as a basis on which retailers can actually invoke the statute is therefore invited by the statute's purposes as revealed in its language.
More importantly, the value of inventory is a truer gauge of the business quality of a mixed dealership than either test advanced by the parties. In this regard, we note that the statute defines farm equipment retailers as those actually "engaged" in the farm equipment retail business. SeeAla. Code (1975), § 8-21-1(5). In a very real sense, a person "engages" in a business to the extent that he or she undertakes a business risk in anticipation of potential profits — the entrepreneur's "engagement" in a business may thus be accurately measured by the extent to which he or she has committed capital or taken on debt to advance that business. His or her business risk, the potential for profit or *Page 101 
loss, is intimately tied to the entrepreneur's allocation of his or her capital. To put it plainly, a person "does business" in the retail context to the extent that he or she buys inventory, commits to sell it, and opens the business to the prospect of failure if the inventory is not in fact sold. Consequently, we regard the legislature's intent in adopting this law as focusing on the value of the inventory actually purchased by a putative farm equipment retailer. If the value of the purchased "farm equipment" inventory exceeds the value of the purchased "yard and garden equipment" inventory, then the retailer is a "farm equipment retailer" under the statute and may invoke its provisions. Such a retailer has committed most of his or her capital or taken on most of his or her debt in anticipation of profits in the farm equipment retail business and should be treated accordingly.
This understanding of the necessary nexus between business risk and the nature of the business "engagement" is not recognized by the two theories advanced by the parties, and both lead to irrational and impractical results. Accordingly, both must be rejected.
The "actual sales" standard advanced by Cahaba Tractor does not recognize that a retailer can still "engage" in a business to little success in terms of sales. For instance, a retailer selling solely farm equipment, i.e., purchasing only undisputed farm equipment for his inventory, might, theoretically, sell no equipment at all for a long period of time. Could it be reasonably contended that such a dealer is not in the farm equipment business during the period of no sales? Although Cahaba Tractor offers the "actual sales" test only in regard to the "mixed dealership" situation, and not our hypothetical "pure dealership," we think that test's inability to adequately assess the nature of a retailer's enterprise is amply illustrated by this example.
Moreover, the "actual sales" test would also appear to undermine one of the statute's purposes, for the very reason set forth above. The effect of Ala. Code (1975), § 8-21-5(8), is that most inventory purchased by a retailer within 48 months prior to termination of a dealership agreement falls under the aegis of the statute. This section thus appears to serve one of the purposes of the statute suggested by Cahaba Tractor at oral argument — protecting farm equipment retailers from being saddled with old or obsolete inventory. As suggested by Cahaba Tractor, the statute arose in part as a consequence of the financial crisis that American farmers have faced in this decade. This crisis also placed significant financial stress on farm equipment retailers such as Cahaba Tractor, who were forced to carry increasingly larger inventories due to slack sales. Accordingly, the statute, and more particularly this provision, would appear to have been passed to protect dealers from being saddled with aging and perhaps obsolete inventories on the termination of their dealership contracts.
We think it clear that such a purpose would only be undermined by adopting an "actual sales" standard in determining whether a retailer is primarily engaged in the farm equipment business. If the statute addresses, at least in part, the economic consequences of poor sales, then only contradictory results could be obtained by applying an "actual sales" standard to determine if a retailer was protected by the statute. A retailer might well have invested most of his or her capital or incurred his or her heaviest debts in building a "farm equipment" inventory, only to be considered outside the scope of the statute, all because the inventory did not in fact sell. When we consider that the statute was apparently passed in part to protect against just such a contingency, we think that the irrationality of an "actual sales" standard is made apparent.
For related reasons, we likewise reject the "authorized product line" standard advanced by John Deere. In at least two particulars, it also fails to adequately assess the nature of a retailer's business undertaking by failing to address a retailer's actual business risks.
First, applying the authorized product line standard would impute to a retailer *Page 102 
"risks" that might not have in fact been undertaken. A retailer might well be authorized to sell a complete line of products, but never in fact sell the full line or even contemplate selling the full line. As the above discussion should make clear, we think the statute is to be tied to the inventory actually purchased by the retailer, and we cannot regard products not so purchased as determining the true nature of a retailer's business, in spite of the fact that the retailer might have contractual rights to purchase alternative products.
Second, we must also reject the implication that a one-to-one correspondence is to be given to all products, regardless of their value, in determining the nature of a business enterprise. A barbecue grill cannot be equated with a tractor for purposes of assessing the business risks and expectations of the retailer.[1] Accordingly, as indicated above, even where a retailer sells a complete line of products, the value of each product as reflected in actual inventory purchases should be considered.
Therefore, "Question One" must be answered in the negative. Neither an "actual sales" standard, nor an "authorized product line" standard, nor a combination of both, is to be used in determining whether a yard and garden retailer is "primarily engaged in the farm equipment business." Instead, the test intended by the legislature is the comparative value of the retailer's actual inventory purchases as between "farm equipment" and "yard and garden equipment," for the reasons set forth above.
We emphasize, however, that the "value of inventory" standard does not refer solely to the inventory on hand at the termination of the dealership. Rather, the values to be compared include all relevant inventory purchases made by a dealer over a certain period of time, to be discussed below. As the above discussion should make clear, we believe the legislature regarded such purchases as the best method of defining the nature of the business. Concentrating on existing inventory alone, however, would often have the effect of reintroducing distortions similar to those encountered with the "actual sales" standard. This is because poor sales of one type of inventory would naturally tend to increase the aggregate value of that type of inventory in the stock on hand, resulting in its overvaluation as compared with other types of inventory that have been routinely purchased and sold in a normal market.
We will further clarify the details of applying this standard in our answers to the remaining certified questions.
 B. Question Two
"Question Two" deals with perceived problems inherent in an "actual sales" standard and consequently does not directly address the standard we believe the legislature intended. Specifically, the question is concerned primarily with what "value" is to be assigned to products under an "actual sales" standard. Are gross revenues or net profits to be determinative? Or, is price to be ignored, and the comparative number of items sold (yard and garden versus farm equipment) to be determinative? Because similar issues exist with regard to the "value of inventory" standard, we will address them by analogy.
As already noted, the comparative number of items purchased as inventory is not determinative, except as the number of individual products increases the aggregate value of the various types of inventory that have been purchased. The focus is on the inventory's value, and specifically on the comparative value of farm equipment versus yard and garden equipment.
We think that the retailer's "net cost," as defined inAla. Code (1975), § 8-21-1(4), is the appropriate measure of an inventory's value for the purpose of determining whether a retailer may invoke the statute. Besides being expressly recognized in the statute, this measure will closely reflect the allocation of capital or debt undertaken by the retailer in buying *Page 103 
and selling his inventory. Accordingly, it is as accurate a measure as we have of the nature of his business "engagement" and the risks he has undertaken. Therefore, in determining whether a "mixed dealership" is "primarily engaged in the farm equipment business," its "net cost" as defined in the statute is to be the determinative factor.
 C. Question Three
"Question Three" also explicitly deals with an issue under the "actual sales" standard, but which must be treated by analogy under the "value of inventory" standard. That question, as we rephrase it, might be asked as follows: what period of time is appropriate for measuring the inventory purchases that determine whether a retailer is "primarily engaged" in the farm equipment business?
We hold that inventory purchases during the 48 months prior to notice of the termination of the contract shall be included in the "value of inventory" assessment. We reach this conclusion based on the language of Ala. Code (1975), § 8-21-5(8), which excludes most inventory older than 48 months from the repurchasing requirements of the statute. We regard this provision as establishing the basic outer limit of the legislature's attempt to protect a retailer's investments in inventory. Consequently, the question of whether a dealer comes within the scope of the statute should also be determined by reference to this 48-month limitation. In the instant case, notice of termination was given in October 1984. Therefore, the inventory purchased from approximately October 1980 to October 1984 should be used to determine Cahaba Tractor's rights under the statute.[2] If Cahaba Tractor was not doing business for this entire period of time, then the time period may be reduced to include such time as Cahaba Tractor was in fact in business.
 D. Question Four
"Question Four" asks whether "equipment that is suitable either for yard and garden applications or for light farming applications [will be] deemed to be 'farm equipment' or 'yard and garden equipment' under [Ala. Code (1975), §8-21-1(5)]," a question applicable to any standard chosen to determine the quality of a retailer's business. We hold that equipment clearly designed to serve such dual purposes is to be considered "farm equipment" under the statute.
We reach this conclusion based on what we perceive to be the legislative intent as determined under the authorities on statutory construction we noted previously. Ala. Code
(1975), § 8-21-1(3) defines "Inventory" as "Farm implements, machinery, utility and industrial equipment, attachments and repair parts." A "farm" has been defined as "[a]ny land or water area devoted to the raising, breeding, or production of a specified type of animal or vegetable life,"American Heritage Dictionary of the English Language
476 (1969). From the plain language of the statute, therefore, we regard the legislature as clearly having intended to include within the definition of inventory any "implements, machinery, utility and industrial equipment, attachments and repair parts" designed to be used in agricultural and animal production. The question before us is whether only those products designedexclusively for farm use were intended by the legislature to be included within the definition of inventory.
We think not, because the adoption of that construction, as compared with a broader conception of the language's meaning, would lead to irrational and unworkable results. See, e.g.,State v. Calumet Hecla Consol. Copper Co., supra.
One need only consider the fact that much undisputed "farm equipment" may also be put to different uses. Tractors, for instance, are not, by their nature, suitable exclusively for farm use. While designed primarily for use on farms, tractors are *Page 104 
versatile machines — they can be adapted for many uses and could be used just as easily in road building, for example, as in farm production. We do not think, however, that anyone would seriously contend that tractors generally ought to be excluded from the definition of "inventory" under the statute, simply because tractors are suitable for (and may in fact be used for) nonfarm uses.
Therefore, we hold that dual-purpose "implements, machinery, utility and industrial equipment, attachments and repair parts" are included within the definition of "inventory" as set forth in the statute, so long as the products were designed, at least in part, to be used in farm production.
In the instant case, there is no dispute over the nature of most of the equipment in question: it is admittedly "dual purpose" equipment, and, under our construction of the statute, the equipment is therefore considered to be "farm" equipment. We recognize, however, that future cases may present factual situations in which the nature of the equipment is not as clear. With the future in mind, therefore, we are compelled to point out that our holding limits the definition of "farm equipment" solely to that equipment which is designed
in some way to assist in agricultural production, including animal husbandry, though that equipment may also be designed for a separate, nonagricultural use or is otherwise adaptable to such a use. In short, we do not hold that every piece of hardware that might incidentally be used on a farm is within the terms of the statute. Multipurpose hardware having no designed-in "farm" use (for instance, power tools) or "pure" yard and garden equipment (lawn mowers or barbecue grills, for instance) are not contemplated by the statute, although a farmer might well use such items, and might in fact use some of them in the production of a crop. Rather, only that machinery and equipment, and those attachments and repair parts and implements, designed at least in part for agricultural production are to be included within the scope of the statute.
 E. Question Five
"Question Five" asks whether the determination of the nature of the retailer's business is to "be restricted to considering the relationship of the dealer/terminating manufacturer" or whether "the dealer's sale of farm equipment produced by other manufacturers" may also be considered. We hold that the retailer's entire business may be considered.
We reach this conclusion on the basis of the language of the statute and the statute's primary purpose, a purpose recited throughout this opinion — i.e., to provide a particular class of farm equipment dealers with certain protections in regard to their inventories. The statute, although focusing on farm equipment inventories, is not single-minded in that focus — the statute clearly protects only a particularclass of dealers carrying such inventories, that is, those "primarily engaged in the farm equipment business,"Ala. Code (1975), § 8-21-1(5), and does not limit that determination to a single supplier of those inventories.
This fact appears most clearly from the language of §8-21-1(5) itself, but it may be gleaned as well from the title of the statute, "Repurchase of Inventory from FarmEquipment Retailers" (emphasis added), see 2A N. Singer,Sutherland Statutory Construction § 47.03 (Sands 4th ed. 1984). Thus, we do not regard the legislature as having intended, by the passage of this statute, to provide a generalized scheme for the repurchase of all "farm equipment" from all potential dealers in such equipment; rather, we think the legislature intended to protect only those retailers who could be considered to be within the class of farm equipment dealers, or, as we have defined that term previously, those dealers whose business risk is primarily tied to the retailing of farm equipment.
Consequently, we can see no logic in restricting the determination of whether a dealer is "primarily" a farm equipment retailer to his relationship with the particular manufacturer who terminates a dealership agreement. We think it evident that such *Page 105 
a restriction was not intended by the legislature, not only because it is not evident from the language of the statute, but because it would also introduce distortions into the determination of whether the dealer was within the "class" protected by the statute. A single manufacturer might supply inventory that is atypical of the dealership's general inventory and, hence, atypical of the true nature of his business venture.[3] Accordingly, all of a dealership's business relationships ought to be considered in determining whether the statute is to apply to that dealership.
 II. Constitutional Issues
John Deere makes various arguments to the effect that the statute is unconstitutional, primarily arguing that it is impermissibly vague and, therefore, violative of due process. We will discuss these issues only briefly, because they were not certified to us. However, we think some discussion is in order to further clarify our answers to the questions that were certified.
Most of John Deere's constitutional challenges relate to a perceived impossibility of deriving the appropriate criteria for determining when a dealer is "primarily engaged in the farm equipment business." In particular, John Deere attacks the "actual sales" standard as being incapable of providing constitutionally sufficient notice and guidelines for application and enforcement of the statute. We think that the "value of inventory" standard, however, is sufficiently certain to be free from these alleged infirmities, particularly in view of the commercial context in which this statute operates. SeeVillage of Hoffman Estates v. Flipside, Hoffman Estates,Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982);Cotton States Mut. Ins. Co. v. Anderson, 749 F.2d 663,668-69 (11th Cir. 1984).
First of all, the value of inventory, as defined in this opinion, is relatively certain, and, we think, subject to reasonable application and proof at trial. Basically, the test requires that, for up to four years, the purchase orders for inventory of the dealer be divided into 1) "farm" and "dual use" equipment purchases and 2) "yard and garden" purchases. The totals of the two (including the adjustments set forth inAla. Code (1975), § 8-21-1(4)) are then compared, and the highest total as between each category determines the nature of the business. Although this is a possibly tedious undertaking, we do not think it is subject to the uncertainty that might underlie application of an "actual sales" standard. The records required would be kept in the normal course of business, and we suspect that modern accounting and inventory control practices are well up to the task. Indeed, the statute itself contemplates significant accounting determinations of various possible values of inventory, see, e.g.,Ala. Code (1975), § 8-21-3, and we note that the contract in the instant case contains a term requiring the dealer to "furnish the [manufacturer] at any time upon request, full information regarding inventory on hand, inventory sold, the proceeds thereof, and any contracts or agreements affecting such inventory."
Moreover, we frankly have significant doubts as to whether such an accounting will even be necessary in the great majority of cases. We suspect that Cahaba Tractor's description of a typical "farm equipment" business is close to the industry *Page 106 
standard. According to Cahaba Tractor, many such businesses overwhelmingly concentrate their resources in the farm equipment business, but maintain a sideline business in more consumer-oriented yard and garden products, usually to even-out seasonal business cycles. These "mixed dealerships," therefore, may often be so one-sided in favor of investments in farm equipment that such an accounting would be an absurdity, because even a casual inspection of inventory purchases would reveal the preponderantly "farm equipment" nature of the business.
John Deere also argues that the statute provides insufficient notice to manufacturers of their rights and liabilities under the statute. We believe that our opinion has clarified whatever ambiguities exist in the statute so as to provide sufficient notice to manufacturers and other suppliers of their rights and potential liabilities under the statute. Although we suspect that there will be few "close" cases under our interpretation of the legislative intent, because most "mixed dealerships" will probably be able to invoke the statute, manufacturers will at least know their risks, and if necessary, may guard against them.[4]
As to the claim that the statute is so vague as to violate the Constitution of Alabama, we think our opinion dispels any notion that the statute is unconstitutionally vague. This statute is not " 'so incomplete, so conflicting, or so vague and indefinite that the court is unable, by the application of the accepted rules of construction, to determine what the legislature intended.' " Plant v. R.L. Reid, Inc.,294 Ala. 155, 161, 313 So.2d 518, 523 (1975) (quoting MarshallCounty Board of Education v. State, 252 Ala. 547, 550,42 So.2d 24, 26 (1949)).
 III. Conclusion
In summary, Ala. Code (1975), § 8-21-1(5), is to be applied by reference to a putative farm equipment retailer's inventory purchases. A dealer is "primarily engaged in the farm equipment business" if his inventory purchases of farm equipment exceed his purchases of yard and garden equipment. Such purchases are to be valued at the retailer's net cost as defined in Ala. Code (1975), § 8-21-1(4), and are to be calculated over a time period extending back to 48 months prior to the time notice of termination is given. If items of inventory can be classified as dual use items, i.e., as items designed for both "farm" and "yard and garden" use, then they are to be classified as "farm" equipment under the statute. The inventory included in making this determination shall include the purchases made by the dealer from all sources and shall not be limited solely to those purchases made from the terminating supplier.
QUESTIONS ANSWERED.
TORBERT, C.J., and MADDOX, JONES, ALMON, SHORES, BEATTY, ADAMS and STEAGALL, JJ., concur.
[1] Cahaba Tractor was "authorized" to sell both such products under its agreement with John Deere.
[2] We are not advised in the briefs of the exact date the notice of termination was given. Naturally, if the parties can identify a more precise date, then that date should be determinative.
[3] We find unconvincing John Deere's argument that a failure to restrict the analysis to the terminating manufacturer would defeat the purpose of the statute, in light of the purpose we have determined above. The essence of this argument is that situations might exist under this construction where a dealer was exclusively a retailer of farm equipment as to one manufacturer, yet could not invoke the statute. Such a situation would exist if the dealer's relationships with other manufacturers were primarily in the yard and garden business and these yard and garden relationships made up the bulk of the retailer's business.
We agree that such a retailer could not invoke the statute, but we think it self-evident that such a situation is not contrary to the legislature's intent. As we noted above, and as is evident throughout this opinion, the statute does not guarantee the repurchase of all farm equipment inventory, but only that inventory held by those primarilyengaged in the farm equipment business. The hypothetical advanced by John Deere presents a dealer who is clearly outside of the "protected" class.
[4] If a manufacturer wanting to concentrate on consumer products considers the risk that the statute will be applied as too great in a particular case, it may easily avoid the statute's application by alteration of its contract with the dealer. This is because only "farm equipment" inventory is subject to repurchase under the statute. See Ala. Code
(1975), § 8-21-1(3). "Yard and garden" inventory is not covered. Consequently, a manufacturer emphasizing consumer products may simply eliminate the right to sell "farm equipment" (including "dual purpose" equipment) from its agreement with the retailer.
A manufacturer emphasizing even in part farm equipment, however, and dealing with typical farm equipment retailers, must take the "risk" the legislature intended — that its contract with the dealer will likely be superseded by the laws of this state.