This case arises from an equipment leasing transaction and presents important questions concerning the interpretation and application of Article 9 of the Uniform Commercial Code as it applies to chattel paper and accounts receivable financing.
In late 1983, Lawson State Community College and Energy Recovery for Industry and Commerce, Inc., began negotiating the sale of a heating, ventilating, and air conditioning system to be installed at the College. In broad outline, this proposed sale was to the effect that Energy Recovery was to act as a dealer-consultant to the College — Energy Recovery was to select, install, and maintain the system to be used by the College. Importantly, as part of its service, Energy Recovery guaranteed the College that Energy Recovery's efforts would result in substantial energy savings.
The purchase price for the proposed equipment and services was $120,000. Instead of ordering this transaction in the form of an outright sale, however, the parties decided to finance the transaction by way of an equipment lease. Under the terms of this arrangement, Energy Recovery was given a lump-sum payment in full for the equipment and its services. Payment was made to Energy Recovery, however, not by the College, but by a financing lessor, First Continental Leasing Corporation, who took title to the equipment from Energy Recovery. First Continental then leased the equipment to the College. Under the terms of this lease, which is styled an "Equipment Lease-Purchase Agreement," the College was required to pay $2,618.68 per month for 60 months for equipment rentals. At the end of the 60 month payment period, the College had the right to purchase the equipment outright for a "concluding payment" of $1.00.
The lease agreement was subject to two subsequent assignments. In the first assignment, First Continental assigned the lease to Christopher Capital Corporation, which held its interest for less than three weeks. Christopher Capital subsequently reassigned the lease to First Westside Bank. First Westside still holds its interest in the lease.
All did not go well as to the underlying contract between the College and Energy Recovery. The College soon found itself dissatisfied, not only with the quality of the equipment itself, which, it is alleged, is defective, but also with the energy savings the College has achieved by hiring Energy Recovery and installing the equipment. The College consequently sued Energy Recovery for breach of warranty as to the quality of the equipment itself and also for fraud for allegedly overstating the energy savings to be gained from Energy Recovery's program for the College.
We are not, however, concerned on this appeal with the claims against Energy Recovery, which are still pending in the trial court. Rather, we are asked to determine whether similar claims for breach of warranty and fraud can also be asserted against the financing lessor, First Continental, and its subsequent assignees, Christopher Capital and First Westside Bank. The College asserted these claims in the trial court, which, on various pre-trial motions, held that such claims could not be asserted in the instant case. In addition, the current holder of the lease, First Westside, asserted a counterclaim for the monies due under the lease, and the trial court entered a judgment in favor of First Westside on this counterclaim. A final judgment pursuant to Rule 54(b), Ala.R.Civ.P., was rendered by the trial court on the disposition of these claims, from which judgment the College appeals. We affirm in part, reverse in part, and remand.
 I. Preliminary Matters
Before proceeding to our analysis of the precise issues in this case, two preliminary matters must be discussed: 1) the applicable standard of review, and 2) the applicable law. We will address each of these matters in turn.
 A. The Standard of Review
There is some confusion as to the applicable standard of review in this case, due to the fact that the claims against First Continental, Christopher Capital, and First Westside were originally challenged on motions *Page 928 
to dismiss pursuant to Rule 12(b)(6), Ala.R.Civ.P. Although the 12(b)(6) motion by First Westside was clearly superseded by a subsequent motion for a summary judgment pursuant to Rule 56, the trial court continuously referred to the motions pending against First Continental and Christopher Capital as motions to dismiss, and, in fact, referred to them as such when it entered its judgment against the College. Consequently, the College argues that the standard of review applicable to 12(b)(6) motions to dismiss applies to this appeal as to these defendants. First Continental and Christopher Capital, however, argue that the trial court actually rendered summary judgment in favor of them, rather than 12(b)(6) dismissals, because matters outside the pleadings were presented to and not excluded by the court in its consideration of the motions.
According to the applicable rule of civil procedure, "[i]f, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Rule 12(b), Ala.R.Civ.P. This Court has consistently adhered to this rule, and has accordingly treated ostensible 12(b)(6) dismissals as summary judgments on appeal, where, as here, it is clear that the trial court considered matters outside the pleadings, e.g.,Boles v. Blackstock, 484 So.2d 1077 (Ala. 1986), and where it is also clear that all parties had notice of the impending conversion of the motion and were given reasonable opportunity to present pertinent material, see Knowles v. Beatty,484 So.2d 370 (Ala. 1986) (reversing trial court's grant of summary judgment where no proper notice had been given); Hales v. FirstNational Bank, 380 So.2d 797 (Ala. 1980) (error for trial court to convert 12(b)(6) motion to motion for summary judgment and grant it without giving proper notice to the parties). In other words,
 "a reviewing court should not automatically treat a dismissal where external materials were not excluded as a summary judgment, although such treatment may be the most common result of such a situation. Rather, the reviewing court must assure itself that summary judgment treatment would be fair to both parties in that the procedural requirements of the applicable rules were observed."
Tele-Communications of Key West, Inc. v. United States,757 F.2d 1330, 1334 (D.C. Cir. 1985) (applying the nearly identical federal rule of civil procedure).
In the instant case, treatment of the dismissals of the claims against First Continental and Christopher Capital as grants of summary judgment is appropriate. We think it clear from the record that the parties all recognized that substantial external evidence was before the trial court by the time it considered these motions. Therefore, it cannot now be contended that there was inadequate notice that the trial court's consideration of these external matters would in effect convert the motions. Moreover, as will become apparent in our subsequent discussion, it is also clear to us that the motion for a summary judgment filed by First Westside had the effect of bringing the issue of at least First Continental's liability into direct and undisputed controversy. In short, First Westside's motion also subsumed the evidentiary matters at issue in the pending motion to dismiss First Continental, and the non-moving party treated this motion as having this effect. In light of these facts, we will apply to this appeal the standard of review applicable to motions for summary judgment. That standard has been defined as follows:
 "On appeal from a trial court's grant of summary judgment, this court must apply the same standard used by the trial court when ruling on the motion. Alabama Power Co. v. Blount Brothers Corp., 445 So.2d 250 (Ala. 1983). In Jehle-Slauson Construction Co. v. Hood-Rich, Architects and Consulting Engineers, 435 So.2d 716 (Ala. 1983), we summarized the standard as follows: *Page 929 
 " 'Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Whatley v. Cardinal Pest Control, 388 So.2d 529 (Ala. 1980); Wheeler v. First Alabama Bank of Birmingham, 364 So.2d 1190 (Ala. 1978); Rule 56, ARCP. "If there is a scintilla of evidence supporting the position of the party against whom the motion for summary judgment is made, so that at trial he would be entitled to go to the jury, a summary judgment may not be granted." Campbell v. Alabama Power Co., 378 So.2d 718, 721 (Ala. 1979); Chiniche v. Smith, 374 So.2d 872 (Ala. 1979). Once a motion for summary judgment has been made, the adverse party ordinarily should not rest on his pleadings, but should respond by setting forth specific facts which show that a material issue of fact does exist. Whatley v. Cardinal Pest Control, 388 So.2d 529 (Ala. 1980); Real Coal, Inc. v. Thompson Tractor Co., 379 So.2d 1249 (Ala. 1980).' Id. at 718."
Wright v. Robinson, 468 So.2d 94, 97 (Ala. 1985); Kemp MotorSales, Inc. v. Lawrenz, 505 So.2d 377 (Ala. 1987).
 B. The Applicable Law
The parties, in their briefs, cite us primarily to the common law of contracts and to Article 9 of the Uniform Commercial Code for the substantive law in this case. They do not, however, suggest which body of law is authoritative. Our examination of this transaction convinces us that Article 9 establishes the controlling law in this case.
One reason we reach this conclusion is that the lease entered into between the College and First Continental is not a "true" lease, but is instead a lease in the nature of a security interest, as contemplated by Ala. Code (1975), § 7-1-201(37) and § 7-9-102. These sections establish that a "lease" allowing the lessee to purchase at a "nominal consideration" the subject-matter of the lease is to be considered a security agreement rather than a "true" lease. See Commerce Union Bankv. John Deere Indus. Equip. Co., 387 So.2d 787 (Ala. 1980); see generally B. Clark, The Law of Secured Transactions under theUniform Commercial Code, at 1-25 through 1-29 (1980). In the instant case, the right of the College to purchase the equipment for a mere $1.00 at the termination of the lease constitutes an option to purchase at a "nominal consideration," and hence, the arrangement between these two parties is no mere bailment lease, but is instead a disguised conditional sale secured by a security agreement. Accordingly, Article 9 applies to this "lease" transaction.
Article 9 also applies to the subsequent assignments of the leases to Christopher Capital and to First Westside. A lease relating to specific goods, whether a "true" lease or a lease in the nature of a security agreement, is defined as "chattel paper" by the UCC, see Ala. Code (1975), § 7-9-105(1)(b) and comment 4, and the Article applies not only to assignments of chattel paper as security but also to the outright sale of chattel paper, see id. §§ 7-1-201(37); 7-9-102(1)(b). Accordingly, Article 9 would provide the law controlling the subsequent assignments of the equipment lease in this case, even if the underlying lease transaction was considered a "true" lease, and regardless of whether the subsequent assignments were made to secure loans from the assignee or constituted outright sales.
However, as noted above, the underlying lease transaction does not involve a "true" lease, but is instead a classic example of what has been called a "tripartite" leasing arrangement. Under such an arrangement, a third-party financing lessor (here, First Continental) provides funds for what is in essence a conditional sale of goods from a supplier (here, Energy Recovery) to the lessee (here, the College). The lease in such a transaction is not a "true" lease, but is instead a lease in the nature of a security agreement. See, generally, B. Clark, supra, at 1-23. Such transactions and the subsequent assignment of the "leases" they give rise to are governed by the UCC, *Page 930 
and we will therefore apply Article 9 to resolve the issues presented to us by this case.
 II. Analysis of Claims Asserted by the College A. Claims Asserted Against the Assignees
We begin our analysis with the claims asserted against Christopher Capital and First Westside Bank. Under the terminology of Article 9, applicable to chattel paper financing, each of these assignees of the lease-security agreement is also a "secured party" as to the complete chattel paper transaction,[1] see Ala. Code (1975), § 7-9-105(m); id.
comment 2. First Continental, the assignor of the lease and the "secured party" as to the original transaction between it and the College, is also defined as the "debtor" as to the complete transaction, see Ala. Code (1975), § 7-9-105(d); id.
comment 2. Similarly, the College, the "debtor" in the original transaction is the "account debtor" for purposes of analyzing the whole transaction, see Ala. Code (1975), § 7-9-105(a); id.
comment 2.
It is clear to us that many of the claims asserted against each secured party-assignee are essentially derivative of the claims for fraud and breach of warranty allegedly arising from the underlying contract between the College (the account debtor) and First Continental (the debtor-assignor). Hence, we are presented with the issue of the extent to which, under the UCC, a secured party-assignee may be held liable to the account debtor for claims the account debtor may assert against the debtor-assignor. We hold that such secured party-assignees may not be sued affirmatively for such claims.
The College relies on Ala. Code (1975), § 7-9-318, for the proposition that it may assert, in some fashion, its breach of warranty and fraud claims against Christopher Capital and First Westside Bank, the assignees of the lease. That section reads, in pertinent part, as follows:
 "Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in § 7-9-206, the rights of an assignee are subject to:
 "(a) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom. . . ."
The College essentially argues that, under the statutory language to the effect that an assignee is "subject to . . . any defense or claim" arising from the contract between the account debtor and the assignor, the assignees "stand in the shoes" of the assignor and are consequently liable, to some extent, for the assignor's misconduct.
The College's precise theory of assignee liability is not without ambiguity. In its various briefs on this appeal, the College focuses on the defensive application of § 7-9-318, primarily as a set-off to First Westside's counterclaim for the monies due under the lease agreement. Its complaint, however, does assert some affirmative claims against the assignees, apparently in an attempt to impose vicarious liability on the assignees for the alleged misconduct of the debtor-assignor. Moreover, even though the College, on this appeal, relies primarily on a defensive application of § 7-9-318, the College does in fact attempt to impose affirmative liability on the assignees under other theories. In view of the fact that § 7-9-318 provides the law applicable to this case, and in view of the fact that the College has apparently attempted, at least in its complaint, to impose some vicarious liability on the assignees for their assignor's misconduct, we think it important to consider whether § 7-9-318 affords an account debtor an affirmative remedy against an assignee.
Although some courts considering the scope of § 9-318 of the UCC have allowed affirmative actions against an assignee based on its language, at least for recovery of payments already made, see, e.g., Farmers Acceptance Corp. v. DeLozier,178 Colo. 291, 496 P.2d 1016 (1972); Massey-Ferguson *Page 931 Credit Corp. v. Brown, 173 Mont. 253, 567 P.2d 440 (1977); Kmart Corp. v. First Pennsylvania Bank, 29 U.C.C. Rep.Ser. 701 (Pa.Ct.Comm.Pl. 1980), the better-reasoned decisions have rejected this approach, see, e.g., Michelin Tires (Canada) Ltd.v. First Nat'l Bank of Boston, 666 F.2d 673 (1st Cir. 1981);Anderson v. Southwest Savings Loan Ass'n, 117 Ariz. 246,571 P.2d 1042 (Ct.App. 1977); Cuchine v. H.O. Bell, Inc., 210 Mont. 312, 682 P.2d 723 (1984); Lydig Const., Inc. v. Rainier Nat'lBank, 40 Wn. App. 141, 697 P.2d 1019 (1985).
The leading case in this regard is Michelin Tires, supra, a case dealing with an assignment of accounts, but equally applicable in this context to chattel paper financing. In analyzing the language of § 9-318, the First Circuit Court of Appeals, applying Massachusetts law, made the following observations:
 "The key statutory language is ambiguous. That 'the rights of an assignee are subject to . . . (a) all the terms of the contract' connotes only that the assignee's rights to recover are limited by the obligor's rights to assert contractual defenses as a set-off, implying that affirmative recovery against the assignee is not intended. See Englestein v. Mintz, 345 Ill. 48, 61, 177 N.E. 746, 752 (1931), quoted in Anderson v. Southwest Savings Loan Association, 117 Ariz. 246, 248, 571 P.2d 1042, 1044 (1977):
 " 'The words "subject to," used in their ordinary sense, mean "subordinate to," "subservient to," or "limited by." There is nothing in the use of the words "subject to," in their ordinary use, which would even hint at the creation of affirmative rights.'
 "On the other hand, the use of the word 'claim' raises the possibility that affirmative recovery was indeed contemplated. However, the section's title and the official Comment support the view that the section does not create affirmative rights. The title reads, 'Defenses Against Assignee.' Official Comment 1 states in pertinent part:
 " 'Subsection (1) makes no substantial change in prior law. An assignee has traditionally been subject to defenses or set-offs existing before an account debtor is notified of the assignment.'
 "Under prior law, an assignee of contract rights was not liable on the contract in the place of his assignor. Wright v. Graustein, 248 Mass. 205, 142 N.E. 797 (1924). Common sense requires that we not twist the 'precarious security' of an assignee into potential liability for his assignor's breach."
Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston, 666 F.2d at 677-78 (footnote omitted).
We believe that this construction of the statute comports with our canons of statutory construction, see, e.g., JohnDeere Co. v. Gamble, 523 So.2d 95 (Ala. 1988), and with prior Alabama law. In Alabama, as in Massachusetts, an assignee of contract rights is generally not affirmatively liable on the contract in the place of his assignor, see Loegler v. C.V. Hill Co., 238 Ala. 606, 193 So. 120 (1940), and in view of the fact that the official comment suggests that prior law was not changed by Ala. Code (1975), § 7-9-318, we believe that theMichelin Tires construction of the statute is correct. Our opinion in this regard is buttressed by the fact that other state courts have specifically adopted the Michelin Tires
holding in the context of chattel paper financing, see Cuchinev. H.O. Bell, Inc., supra; Anderson v. Southwest Savings LoanAss'n, supra; by the fact that the commentators appear to have generally approved of the decision, see B. Clark, The Law ofSecured Transactions Under the Uniform Commercial Code, at S11-12 (1987 Cum.Supp.); Henson, A Problem InvolvingAssignments of Accounts under Article 9, 40 Wn. Lee L. Rev.
41 (1983); and by the fact that the rule espoused by this construction of the statute is in accord with the general law of contracts as set forth in the Restatement, see Restatement(Second) of Contracts § 336 comment c (1981) ("[T]he assignee is not subject to affirmative liability on such a claim unless he contracts to assume such liability"). *Page 932 
Moreover, any internal ambiguities in the language of § 7-9-318 are clarified by consideration of a sister provision,Ala. Code (1975), § 7-9-317. That section provides that "[t]he mere existence of a security interest . . . does not impose contract or tort liability upon the secured party for the debtor's acts or omissions." Hence, the assignees in this case (who are also considered "secured parties" as to the chattel paper transaction) are generally insulated by this section from affirmative tort and contract liability arising from any misconduct by the assignor, First Continental (the "debtor" in the chattel paper transaction), see Marron v. H.O. PennMachinery Co., 518 F. Supp. 1069, 32 U.C.C. Rep.Serv. 342 (D.Conn. 1981) (assignee of equipment lease not liable for assignor's breaches of warranty or negligence, or in strict tort liability due to operation of U.C.C. § 9-317) (applying Connecticut law). See generally B. Clark, The Law of SecuredTransactions under the Uniform Commercial Code, at 11-18 through 11-20 (1982).
Accordingly, no affirmative liability on the part of a secured party-assignee arises from an assignor-debtor's misconduct. The UCC rule as set forth in Ala. Code (1975), § 7-9-318, was not intended to create such a cause of action, and § 7-9-317 clearly insulates a secured party in such situations. As the official comment to § 7-9-318 makes clear, the section preserves the account debtor's traditional right to interpose defensively whatever claims and defenses he has against the assignor in a suit by the assignee against the account debtor; it does not, however, subject the assignee to vicarious liability for the assignor's misconduct. "In other words, although the assignee may be unable to collect the contract proceeds to amortize the debt, he will not be required to cough up damages for the account debtor," B. Clark, supra, at 11-18, including the recovery of payments already made to the assignee under the terms of the contract.[2]
These rules spring not from a love of banks, but from a love of credit and from a common sense recognition of the realities of chattel paper and accounts receivable financing. The bank or finance company is in the business of extending credit — it usually has no responsibility as to the underlying transaction and virtually no power to enforce the adequate performance of the underlying obligation. Thus, placing the bank in a position of liability for, say, breach of warranty, would be to impose costs on the actor least capable of correcting or preventing the defective performance. The result would be an inordinate increase in the cost of credit, with no discernible benefit accruing to society in the way of better manufactured products or more efficient services. Outside of consumer transactions, the risk of defective performance that the law will impose on the financer is generally limited to the risk that he cannot fully collect payments due under his loan, and we will extend it no further.
Applying these rules to the instant case, we hold that the trial court correctly granted summary judgments against the College as to any affirmative claims under Ala. Code (1975), § 7-9-318. As the previous discussion should make clear, there is no genuine issue of material fact as to these two parties' status as secured parties, and, in this case, under the controlling law of the UCC, each "moving party is entitled to a judgment as a matter of law." Rule 56(c), Ala.R.Civ.P.
Moreover, our examination of the record convinces us that both assignees met their burden under Rule 56, Ala.R.Civ.P., of demonstrating that there existed no genuine issue of material fact as to any claims of fraud asserted against them directly, and not vicariously. The evidence in this case affirmatively shows only the most tenuous *Page 933 
relationship between the assignees and the alleged fraud by Energy Recovery and First Continental. Indeed, the evidence before the trial court and available to the movants indicates that the assignees were just that — remote parties who received contractual rights under a deal that subsequently became the center of a dispute. In fact, the assignee "closest" to the deal, Christopher Capital, had previously been a party to only three leases with entities located in Alabama, leases completely unrelated to the instant case, and there is no evidence in the record indicating any kind of continuing relationship between the assignees and the parties that allegedly acted fraudulently. Such evidence is inconsistent with any inference that the assignees were participants in, or had actual or constructive knowledge of, any acts of fraud by Energy Recovery or First Continental.
In opposition to this showing, the College argues that the swift assignments of the lease-security agreement from First Continental to the assignees presents a scintilla of evidence that the assignees knew or should have known of First Continental's alleged fraud. We disagree.
 " 'Evidence, however, which affords nothing more than mere speculation, conjecture, or guess is insufficient to warrant the submission of a case to the jury.' "
Durbin v. B.W. Capps Son, Inc., 522 So.2d 766, 769 (Ala. 1988) (quoting Spray-berry v. First National Bank, 465 So.2d 1111,1114 (Ala. 1984)).
To hold that the efficient transfer of financial documents alone presents a scintilla of evidence that a party was either a participant in, or knew of or should have known of, the transferor's fraud, would be to require submission to the jury of cases founded on sheerest speculation. Even under the liberal scintilla rule, such a case is unworthy of jury consideration, and the trial court correctly held against the College on this matter.[3]
Accordingly, the trial court correctly granted summary judgments against the College as to any affirmative claims against the secured party-assignees in this case.[4] However, as noted previously, the College, under Ala. Code (1975), § 7-9-318, has the right, absent an effective waiver-of-defense clause,[5] to assert any claims it has against its debtor-assignor in defense of a suit by a secured party-assignee for payments due under the contract. The trial court granted a summary judgment against the College on First Westside's counterclaim for the monies due under the lease; hence, we must determine whether the trial court committed error on this point because the College had a good defense to this counterclaim based on its claims against First Continental for its alleged misconduct. We now turn to that analysis.
 B. Claims Asserted Against the Assignor
The College alleges that First Continental has breached various warranties regarding the equipment and has committed a fraud upon the College. These theories depend upon the contention that First Continental *Page 934 
was a manufacturer of or dealer in the equipment installed at the College, and upon the contention that First Continental's relationship with Energy Recovery was such that it was a knowing facilitator of and therefore a participant in Energy Recovery's alleged overstatement of the energy savings to be derived from the installation of the equipment.
We turn first to the claim for breach of warranty. Our examination of the record has convinced us that First Continental and First Westside have demonstrated that no genuine issue of material fact exists as to First Continental's warranty liability. There was none.
The evidence shows that First Continental was neither a manufacturer of, nor a dealer in, the heating, ventilating, and air conditioning equipment at the College. In fact, the evidence affirmatively shows that First Continental was purely a financing lessor. For instance, the lease-security agreement itself contains a clause to the effect that First Continental "is neither a manufacturer nor a vendor of such equipment," and we find no evidence in the record reasonably contradicting this contractual statement. In addition, we note that, in an affidavit, the president of the College stated that "[d]uring the negotiations between [the College] and [Energy Recovery], I had no direct personal contact with First Continental. The only contact between [the College] and First Continental was through written documents, such as the [lease-security agreement]. . . ."
We do not see how any liability for breach of warranty could accrue against First Continental on these facts. Although we have recognized that the UCC's implied warranties can be applied to lease transactions, see Skelton v. Druid City Hosp.Bd., 459 So.2d 818 (Ala. 1984), First Continental is a financing lessor, not a "merchant" lessor, and, it not being a dealer in the goods in dispute, the implied warranty of merchantability would not arise in favor of the College, see Ala. Code (1975), §§ 7-2-104(1), 7-2-314; All-States Leasing Co. v. Ochs, 42 Or. App. 319, 600 P.2d 899 (1979). Similarly, any liability based on the implied warranty of fitness for a particular purpose, see Ala. Code (1975), § 7-2-315, is foreclosed, because there is no evidence that the College relied on any skill or judgment of First Continental in the selection of the equipment, see All-States Leasing Co. v. Ochs, supra. Finally, the lack of any communication by First Continental relating to the quality of the goods, independent of the contract documents, which disclaim all warranties, forecloses any claim based on any express warranties made by First Continental underAla. Code (1975), § 7-2-313. See generally Boss, Panacea orNightmare? Leases in Article 2, 64 B.U.L.Rev. 39, 67-72 (1984) (surveying the law of lessor warranty liability in the tripartite leasing context).[6]
In short, there is not a scintilla of evidence in the record to support the College's breach of warranty claim, and the trial court did not err in holding that this claim did not lie against First Continental, and, consequently, could not be asserted defensively against First Westside's counter-claim.
We reach a different conclusion, however, on the issue of whether the summary judgment was proper on the fraud claim. We reach this conclusion because we do not believe that either First Continental or First Westside met its burden under Rule 56, Ala.R.Civ.P., of demonstrating that no genuine issue of material fact exists as to the fraud claim. See Butler v.Michigan Mut. Ins. Co., 402 So.2d 949 (Ala. 1981).
Although the evidence was such that the movants' burden was met as to any independent misrepresentation by First Continental, the evidence is much less clear on the issue of the alleged fraudulent relationship between First Continental and Energy Recovery. In Alabama, one "who joins in the consummation of a transaction, known *Page 935 
to have been negotiated by fraud, becomes a party to the fraud." Jim Short Ford Sales, Inc. v. Washington, 384 So.2d 83,86 (Ala. 1980). The evidence that was available to the movants is sketchy at best as to nature of the relationship between Energy Recovery and First Continental, and it is unclear as well as to First Continental's opportunity to know of the alleged fraud, and, in fact, as to whether any fraud at all was committed by Energy Recovery. What was available[7] were the facts that Energy Recovery and First Continental had entered into some kind of relationship prior to or contemporaneously with the deal with the College and that First Continental assisted in the consummation of the transaction. The nature and scope of that relationship, however, is largely undisclosed by the evidence available to the trial court or the movants, and, in fact, appears to have been subject to little or no evidentiary testing by the parties on the motions for summary judgment. Accordingly, although there is only weak evidence that First Continental was a participant in the alleged fraud, and it appears highly unlikely that the College can ultimately prevail on this claim, we nevertheless are compelled to hold that the movants have failed to demonstrate an absence of genuine issues of material fact on their motions for summary judgment.
We emphasize that proof solely of a financial relationship, whereby a bank or finance company merely serves as a "friendly" financer for a defrauding party's customers, does not present a scintilla of evidence of joint fraud. Such arrangements are common, and to impute fraud to such financers solely on this basis would be to subject them to complete jury trials on the basis of purely speculative claims. See Durbin v. B.W. Capps Son, Inc., supra; see also Ala. Code (1975), § 7-9-317. We hold only that, on the record in the instant case, we cannot determine whether First Continental is a mere "financer" or something more.
We would also emphasize that we disagree with the College's contention that the movants must introduce affirmative evidence to negate these claims before they have met their burden. The United States Supreme Court, construing the nearly identical federal rule, has recently held that a moving party in the position of First Continental and First Westside need not prove a negative to prevail on a motion for a summary judgment:
 "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' In our view, the plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. '[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). . . .' Anderson v. Liberty Lobby, Inc., [477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202
(1986)]. *Page 936 
 "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact. But . . . we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim."
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548,2552-53, 91 L.Ed.2d 265 (1986). Accordingly, summary judgment may ultimately be available to the movants on these claims, regardless of whether they introduce evidence negating the fraud claim.
 III. Conclusion
The judgment of the trial court is affirmed as to any affirmative claims for relief asserted against the assignees, Christopher Capital and First Westside. The trial court's judgment in favor of First Continental as to the breach of warranty claim is also affirmed. We reverse the trial court's judgment as to the fraud claim against First Continental, and, consequently, we also reverse the judgment entered on the counterclaim in favor of First Westside. The cause is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
TORBERT, C.J., and MADDOX, ALMON and BEATTY, JJ., concur.
[1] The "two-tiered" nature of the chattel paper transaction is described in D. Baker, A Lawyer's Basic Guide to SecuredTransactions 52-53 (1983).
[2] "There is nothing in § 9-318 that would suggest that the account debtor could recover payments already made to the bank in the ordinary course of financing; that section does no more than prohibit the bank from collecting payments from the account debtor in certain circumstances. Also, § 9-317 seems to insulate the secured party in such a situation."
B. Clark, supra, at S11-9 (1987 Cum.Supp.).
[3] We do not think that any claims for breach of warranty were affirmatively asserted against the assignees in the College's complaint, although the pleading does contain some ambiguous language in this regard. As with the fraud claims, however, such warranty claims are without merit as affirmatively asserted against the assignees, because the assignees made no express warranties and they are not otherwise liable under any implied warranties provided for by the UCC. See the analysis of such claims as they apply to First Continental in Part II B of this opinion, infra.
[4] Our holding pretermits consideration of the issue of whether sufficient contacts existed for Alabama's courts to exercise in personam jurisdiction over Christopher Capital.
[5] Although the College broadly states that the contract contained no such waiver, we do not reach this issue on this appeal, because it was apparently not argued below. Accordingly, we make no findings of fact or legal determinations as to whether such a clause exists, or whether such a clause, if one does exist, conforms to the requirements of Ala. Code (1975), § 7-9-206; see, e.g., Noblett v. GeneralElectric Credit Corp., 400 F.2d 442 (10th Cir. 1968), cert.denied, 393 U.S. 935, 89 S.Ct. 295, 21 L.Ed.2d 271 (1968).
[6] This commentator correctly points out that an express warranty should not be considered to arise from a mere product description in a lease agreement in the context of a tripartite arrangement, whatever the effect such a description might have in a normal sales transaction, see id. at 69-72.
[7] We have not considered the deposition of Robert Furlong, president of Energy Recovery, submitted with this appeal, because it was filed after the trial court had already rendered the summary judgments at issue on this appeal. See Hill v.Talladega College, 502 So.2d 735, 737 (Ala. 1987)("our review of a trial court's ruling on a motion for summary judgment is limited to the same factors that were considered by the trial court in making its decision").