On December 16, 1999, the City of Mountain Brook sued Scott Scott, Inc., Walter F. Scott, Jr., Walter F. Scott III, Barbara Ann Scott,[1]
Sara Heard Allred, Virgil Heard, Crestline Center Partnership,[2] 1st Allred Income Trust,[3] and Jefferson Properties, Ltd.,[4] seeking to collect allegedly owed and unpaid business license taxes. We refer to the defendants collectively as "the Scotts." Their brief on appeal, filed formally on behalf of all of the defendants, states: "The individual Scotts are related by blood or marriage and hold the properties in their individual capacities or through corporations or partnerships which are also defendants in this action." Moreover, the Scotts chose to defend this suit collectively, and they do not assert in their brief to this Court any individual or respective defenses as to the City's claims.
In its action, the City alleged that the Scotts were in the business of leasing property within the City and that they had failed to pay the business license taxes required for the operation of such a business. The Scotts answered the City's complaint by asserting that their ownership of leased real property within the City was not a "business" within the ambit of the City's ordinances imposing the business license tax. After extensive discovery, the City filed a motion for a summary judgment on June 23, 2000, and the Scotts filed a motion for a summary judgment on August 15, 2000. The trial court held a hearing on the motions for a summary judgment on October 13, 2000. The circuit judge who conducted the hearing retired before an order was entered, and the Scotts filed a motion, requesting his successor to take the motions for a summary judgment under submission or to reset the motions for another hearing.
On July 6, 2001, the trial court entered a summary judgment in favor of the City. The trial court's order set out the facts and the controlling ordinances, as well as the history of those ordinances. The July 6, 2001, order of the trial court stated, in pertinent part:
 "Involved in this action is the issue of whether or not the Scotts owe to the City of Mountain Brook money due for business licenses levied against Defendants for the calendar years 1994-1999 under the various city ordinances governing the imposition of said licenses during that period. There is no genuine dispute of the material facts in this case with regard to whether or not the Scotts own property within the city limits of the City of Mountain Brook and that they realize rental income from the properties so owned.
 "According to the affidavits submitted by Defendants, this case involves four (4) parcels of real estate, all of which generate rental income, described as follows:
 "1. Oak Street Garden Shop — Owned individually by Defendant Walter F. Scott, Jr. and Defendant Walter F. Scott, III, leased directly by the Scotts.
 "2. Crestline Corners — Until 1998, owned by Defendants Sara Heard Allred, Virgil Heard and Barbara Ann Scott. Since 1998, owned by Defendant Jefferson Properties, and since 1994 managed by Engle Realty.
 "3. Country Club Park — Owned since 1994 by Scott Scott, Inc., and leased by [Southpace Management], Inc. *Page 581 
 "4. The Cahaba Road Property — Owned in 1994 by Barbara Ann Scott and Sarah Heard Allred. Defendant Allred transferred her interest to Defendant 1st Allred Income Trust in 1995; Defendant Scott transferred her interest to Defendant Jefferson Properties in 1998; currently the property is owned jointly by Defendant 1st Allred Income Trust and Defendant Jefferson Properties and is managed by Eason, Graham and Sandner.
". . . .
 "The relevant portions of the ordinances for which [the Scotts seek] this Court's review are as follows:
"Effective from January 1, 1988 to December 31, 1995
 "Ordinance No. 959 (Repealing Ordinance No. 869 and To Adopt a New Business License Code)
 "`Section 2.7.a. Each person engaged as an agent for the business of buying, selling, renting or exchanging real estate . . . the license shall be $200.00 plus an amount equal to 1/2 of 1% of the gross receipts for such business in excess of $50,000.00 during the next preceding year.
 "`Section 2.7.d Each person, firm or corporation engaged in the business of renting or leasing real property which is located within the City of Mountain Brook and which is owned by such person, firm or corporation . . . shall pay a license fee . . .
 "`Section 26. Any person, firm or corporation violating any provision of this ordinance shall, upon conviction, be fined not more than one hundred dollars ($100.00) and may also as an additional punishment be sentenced to jail or to hard labor for said City for not more than six months.' (Emphasis added [in trial court's order].)
"2. Effective from January 1, 1995 to February 13, 1995
"Ordinance No. 1178 (repealing Ordinance No. 959 inter alia)
"Section 3.6.D.
 "`Each person who has an office or other place of business in the City and who is engaged in the business of leasing to another person real property which is located within or without the City and which is owned by such person, including, but not limited to houses, apartments, commercial buildings, industrial buildings, storage buildings and office buildings shall pay a license tax as provided hereafter. . . .
 "`Each person who has an office or other place of business in the City and who is engaged in the business of managing or serving as the leasing agent for real property . . . owned by another person, regardless of whether such real property is located within or without the City, shall pay a license tax as provided hereafter.'
"Section 9(b) Definition of `Gross receipts.'
 "`If the amount of the license tax is based upon gross receipts, the term, "gross receipts," unless the contrary clearly appears, shall mean the entire receipts of the business, occupation, profession or trade engaged in, . . . and there shall not be deducted from such receipts any amounts not herein specifically provided for.'
"Section 24. Punishment for Violation of Ordinance.
 "`Any person violating any provision of this ordinance shall, upon conviction, be fined not more than $500.00 and may also, as additional punishment, be sentenced to jail or to hard labor for said City for not more than *Page 582 
180 days.' (Emphasis added [to Section 3.6.D. in trial court's order].)
"3. Effective from February 13, 1995 to December 15, 1997
 "Ordinance No. 1188 (Amending Ordinance No. 1178, Section 3.6.D., inter alia)
 "`D. Leasing. Each person who is engaged in the business of leasing to another party real property which is located in the City and which is owned by such person . . . shall pay a license tax as provided hereafter. . . .
 "`Each person who is engaged in the business of managing or serving as the leasing agent for real property located in the city . . . owned by another person shall pay a license tax as provided hereafter.' (Emphasis added [in trial court's order].)
"4. Effective from December 15, 1997 to September 28, 1998
 "Ordinance No. 1293 (Further amending Ordinance No. 1178, inter alia)
 "`2. Section 3.6.D. Leasing of Real Property other than Dwellings.
 "`a. Each person who is engaged in leasing to another party real property (other than dwellings) which is located within the City, and is owned by such person, . . . shall pay a license tax in the amount equal to one-half of one percent (1/2%) of the gross receipts from the leasing of such real property during the preceding calendar year. . . .'
 "`c. Each person who is engaged in the business of
managing, leasing, or serving as the leasing agent for real property (other than dwellings) which is located within the City and is owned by another person . . . shall pay a license tax . . . (emphasis added [in trial court's order]).'
"5. Effective from September 28, 1998 to December 14, 1998
 "Ordinance No. 1330 (Amendment and restatement of Ordinance No. 1178, inter alia)
 "`Section 3.6.F(1) Leasing of Real Property Other Than Dwellings.
 "`Each person who is engaged in leasing to another party real property (other than dwellings) which is located within the City and is owned by such person . . . shall pay a license tax in the amount equal to 1/2 of 1% of the gross receipts from the leasing of such real property. . . .
 "`Section 3.6.F(2) Each person who is engaged in the business of managing, leasing, or serving as the leasing agent for, real property (other than dwellings) which is located within the City and is owned by another person, . . . shall pay a license tax in the amount equal to 1/2 of 1% of the gross commissions or other payments received. . . .' (Emphasis added [in trial court's order].)
"6. Effective from December 14, 1998 through 1999
 "Ordinance No. 1341 (Amendment and restatement of Ordinance No. 1330)
 "`Section 3.6.F(1) Leasing of Real Property Other Than Dwellings.
 "`. . . As used in this subsection, the term "gross receipts" shall include total receipts . . . less the commissions or fees paid to the designated rental property manager or leasing agent.
 "`(2) Each person who is engaged in the business of
managing, leasing, or serving as the leasing agent for, real property (other than dwellings) which is located within the City and is owned by another person . . . shall pay a license tax in the amount equal to 1/4 of 1% (0.25%) of gross commissions. . . . *Page 583 
As used in this subsection, the term "gross commission . . ." shall include total receipts . . . less amounts distributed either directly or indirectly to the property owner. . . .
"`Section 24. Punishment for Violation of Ordinance.
 "`Any person violating any provision of this ordinance shall, upon conviction, be fined not more than $500.00 and may also, as additional punishment, be sentenced to jail or to hard labor for said City for not more than 180 days.' (Emphasis added [to Section 3.6.F(2) in trial court's order].)
 "Though amended on six different occasions over a period of three years, with some amendments being effective for as short a period as six weeks, with regard to this type of business activity there is a consistency noted by the Court through this evolutionary legislative process that owners of rental property have been subject to the business license requirement as well as leasing agencies throughout the entire relevant period.
". . . .
 "The Court thus finds based upon this authority, that to the extent that the terms `business' and `engaged in business' are not defined in the municipal ordinance[s], to the extent that those terms have a technical meaning, or a common meaning that is not inconsistent with the meaning of these terms as applied by the general laws of the State of Alabama, then there is no vagueness upon which the Court could act to declare the ordinance unconstitutional. The Estes [v. City of Gadsden, 266 Ala. 166, 94 So.2d 744
(1957)] decision appears to establish a precedent for the proposition that a broad definition with sweeping coverage is to be applied in the absence of any limiting language which appears within the text of the business license ordinance itself. Accordingly, the Court notes that for purposes of State taxation in the sales and use tax context, `business' is defined as:
 "`All activities engaged in, or caused to be engaged in, with the object of gain, profit, benefit, or advantage, either direct or indirect, . . .' Ala. Code § 40-23-1(a)(12).
 "The ordinances involved in this matter are revenue matters which impose a tax on the privilege of doing business or engaging in business within the city limits of the City of Mountain Brook. Owning real commercial investment property located in the City of Mountain Brook for the object of gain or profit is a business upon which the City has imposed a business license requirement, as defined by the ordinance. This act by the City is not outside of its statutory authority granted by the State of Alabama to impose and levy a privilege tax in the form of a business license, nor does the ordinance leave a person of ordinary intelligence in doubt with regard to its scope of coverage, particularly since the ordinances differentiate between one who is in the business of leasing to third persons realty which they own from those who are in the business of leasing to third persons property owned by others, such as a property management company.
 "Defendants' other constitutional issue with regard to overbreadth is equally without merit.
". . . .
 "In the case now before the Court, Defendants have not made a showing that their activity is constitutionally protected or otherwise due to be exempted from the legitimate scope of the ordinance.
 "Defendants' argument that the ordinance contemplates multiple or `double *Page 584 
taxation' due to the fact that for a segment of the relevant licensing period, the ordinance required a license from the owner of rental property that was based upon gross receipts with no credit allowed for commissions paid, and imposed a similar license upon leasing agencies based upon commissions earned so that the commissions were subject to double taxation. However, since this ordinance does not impose a tax on income but on activity, there is no double taxation. Within the constitutional inquiry context, this same issue arises when the same taxpayer is subjected to taxation in multiple jurisdictions based upon the same income or activity. See M Associates, Inc. v. City of Irondale, 723 So.2d 592 (Ala. 1998). In the case before the Court, there is no evidence in the submissions that any of the gross receipts upon which the license is based is derived from outside of the jurisdiction of the City of Mountain Brook[;] therefore the Court can find no merit with this position.
". . . .
 "Therefore, upon consideration of the authority cited herein, it is hereby ORDERED, ADJUDGED and DECREED that Plaintiffs' Motion for Summary Judgment is hereby GRANTED as against all Defendants. Plaintiff is hereby given 30 days to present to the Court evidence of all damages to be assessed with regard to each Defendant relevant to each parcel of commercial property."
On July 26, 2001, the City filed a motion requesting more time to compute their damages and filed interrogatories for the Scotts to answer. On August 14, 2001, the trial court granted the City's motion, extending the time by 30 days. The Scotts failed to respond to the interrogatories, and on August 30, 2001, the City filed a motion to compel the Scotts to answer and a motion for another extension of time. On October 3, 2001, the trial court granted the motion to compel.[5]
Also on October 3, 2001, the City filed a "submission of damages," which purported to show the damages owed the City by the Scotts based on their activity and ownership interests in the real property at issue.
On October 10, 2001, the Scotts filed an "objection to entry of judgment," objecting to the trial court's July 6, 2001, summary judgment on various grounds. On November 1, 2001, the trial court entered an "Order and Judgment," awarding the City damages "in the total amount of Eighty-Five Thousand Five Hundred Ninety-Five and 30/100 Dollars ($85,595.30)." The order also found the Scotts severally liable for damages based on the activity and ownership interests of the Scotts during the 1994-2001 tax years.[6] The trial court relied on information provided it by the City, which had obtained the information necessary to calculate such damages directly from the Scotts.
The Scotts appeal, arguing (1) that the ordinances under which the City levied the business license taxes are unconstitutionally vague or overbroad; (2) that their ownership of real property that is leased commercially within the City is not subject to the City's business license taxes because, they say, the City's ordinances did not and *Page 585 
do not apply to their ownership of the properties; (3) that the penalties imposed by the City's ordinances for failure to pay the business license taxes are unreasonable and excessive; and (4) that some of the ordinances impose double taxation. We affirm the judgment of the trial court.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
 I. Facts
The record shows that the four properties owned by the Scotts within the City were leased commercially and that the Scotts took various actions to prepare and to maintain commercial leases on the properties, including (1) obtaining the services of managing companies; (2) evaluating contracts relating to the leasing of the properties; (3) reviewing, and making decisions related to, the profitability of the leased properties; and (4) frequently communicating with one another regarding the commercial leasing of their properties.
Andrew Scott, a partner in Jefferson Properties, Ltd., speaking on behalf of the Scotts, stated in his affidavit that "[w]ith regard to the properties that are leased through professional agencies, neither I nor any of the other [Scotts] have devoted time, attention or labor to the leasing of such properties, except as to perform ministerial tasks such as signing the lease agreements." However, David Corey, vice president of Southpace Management, Inc., one of the managing companies employed by the Scotts, when asked during his deposition whether signing a lease required a devotion of time, attention, or labor, testified: "Okay. It has — [the signing of a lease is] a function that has to happen. So, do they have to devote time to it? Certainly." Corey also explained that Southpace would contact the owners for discussions of rates, as well as any questions regarding tenants.
Walter Scott, Jr., and Walter Scott III own the Oak Street Property. No agent has ever been hired to manage that property or otherwise to assist in the leasing process. Regarding the property, Walter F. Scott III, testified that he had negotiated a lease with a tenant, and that if any problems were to arise with the property, either he or his father, Walter F. Scott, Jr., would deal with them. When asked if he or his father leased the property for *Page 586 
profit, Walter Scott III testified, "What do you mean by profit? . . . A return. I'm not sure I would use the word profit." When asked why he purchased the property and what he hoped to achieve through his investment, he testified: "I thought it would be a good investment. . . . I hoped to achieve a nice, happy retirement one day."
The Crestline Center Partnership is shown as the landlord in leases of the Crestline Corners property, and the lease agreements for that property state that "landlord hereby leases to tenant." Crestline Center Partnership also executes lease agreements, and its agent is required to seek the approval of the partnership on all expenditures in excess of $1,000, as well as all capital expenditures. Crestline Center Partnership has also been involved in various decisions regarding the property, including assignments of its leases.
The record shows that Scott Scott, Inc., owns the Country Club Park property. Walter F. Scott, Jr., who is the vice president, secretary, and treasurer of Scott Scott, Inc., testified that the company's business is developing real estate and that it also leases real estate in the City. Although the record shows that Scott Scott, Inc., has hired management companies to help manage the property, it also shows that the officers of Scott Scott, Inc., have taken an active role in facilitating the leasing process by signing leases, discussing lease provisions with tenants and prospective tenants, approving rental rates, reviewing proposed amendments to leases, and retaining the right to approve all expenses associated with the property that exceed $1,000.
When asked during his deposition, "Would you agree that Scott 
Scott leases [the `Country Club Park' property] to third parties," Walter F. Scott, Jr., replied, "yes." When asked, "Am I correct that Scott Scott leases those properties for profit?" he replied, "hopefully." When asked, "[t]hat's the object, right?" he replied, "[t]hat's the object." Moreover, when asked, "and so, the leasing of those properties is engaged in with the object of gain," he responded, "yes." Notably, this property, as all of the other properties, with the exception of the Oak Street property, was tended to by a "leasing/management" company.
The Cahaba Road property consisted of two units, both of which are leased to third parties. The record shows that Andrew Scott represented the owners in the leasing of the upstairs unit, setting rental rates and making arrangements for structural repairs as well as negotiating with the tenants. Regarding the downstairs unit, Andrew Scott's affidavit states that Eason, Graham and Sandner are responsible for its management and leasing. However, Andrew testified in deposition that if important changes to the property were contemplated or large expenditures of capital were needed, he would seek the approval of the owners before continuing. Several of the leases in the record regarding the Cahaba Road property show Sarah Allred and Barbara Scott as the landlords, and state that the "Landlord hereby leases and Tenant hereby rents from Landlord . . . ." One of those leases was signed on February 26, 1994, by both Sarah and Barbara. That lease shows that it would continue until its termination date on February 28, 1999. Another lease regarding the same real property, signed only by Barbara as lessor, began on or around March 1, 1999, and states it will continue until April 30, 2004.
Steven Boone, the City's director of finance, when asked in his deposition to specify how the City applied the ordinances when it attempted to collect from *Page 587 
the Scotts the business license taxes that were due, testified:
 "A. We looked — for the periods that we were collecting for, we looked to see which ordinance applied at that time. I think even during the five years that we were collecting there were rate changes and schedule changes on the fees, but we tried to make sure that we were applying the appropriate ordinance to the appropriate license year.
 "Q. Okay. Tell me if I'm understanding you, this is correct: You would look for the year in which a license had not been purchased, you would look for the ordinance that was in effect that year and apply the terms of the ordinance, including rate, to determine how much was owed for each year?
"A. Yes."
In addition to the excerpts from the ordinances included in the trial judge's summary-judgment order, the following sections, contained in the record, from Ordinances No. 959 and No. 1178 are also applicable. Ordinance No. 959 provides, in pertinent part:
 "Section 10.(a) Where the amount of the license is based upon the volume or receipts, sales, etc., in the absence of any other specific provision therefor, the sale of merchandise and receipts referred to are those of such business for the next year preceding the current license year, provided however, that such business did not operate the entire next preceding year, then the license tax shall be based upon that amount which bears the same relationship to the actual amount of sales or receipts during such preceding year as the entire year bears to such time which said business operated during each preceding year. Further provided that if the operation of such business did not commence until after the first day of July 1988, or the first day of July in each succeeding year thereafter, until this ordinance is repealed or revised, the operator therefor shall pay at the end of three months after operation started in an amount on a basis similar to that set out above and in any case a minimum license required in advance.
". . . .
 "Section 16. All licenses are due, except as otherwise herein provided, on the first day of January of each year, or the day upon which business is begun."
Ordinance No. 1178 provides, in pertinent part:
 "Section 15. DUE DATE OF LICENSE TAX. All license taxes are due, except as otherwise herein provided, on the first day of January of each year, or the day upon which the business for which the license is issued is begun.
". . . .
 "Section 17. BUSINESS LICENSE FOR PARTIAL YEAR. Any person liable for any license tax hereunder who begins the business, occupation, trade or profession for which such license is payable on or after July 1 of any year shall be required to pay for the remainder of such year a license tax in the amount equal to one-half of the annual license tax otherwise provided for under this ordinance."
The ordinances enacted subsequent to Ordinance No. 1178 served to amend or restate Ordinance No. 1178. In addition, each of the ordinances provides for a set license tax based upon either the "gross annual business"[7] or the "gross receipts,"[8] and in the event the gross annual business *Page 588 
or gross receipts equal or exceed $50,000, then the ordinances provide for a percentage of the gross annual business or gross receipts to be added to the set license tax.
The Scotts do not challenge the power of the City to levy license taxes on any business, vocation, or occupation conducted within its confines. This authority arises from § 11-51-90, Ala. Code 1975, which provides in pertinent part:
 "(a) All municipalities shall have the following powers:
 "(1) To license any exhibition, trade, business, vocation, occupation, or profession not prohibited by the Constitution or laws of the state which may be engaged in or carried on in the city or town.
 "(2) To fix the amount of licenses, the time for which they are to run, not exceeding one year, to provide a penalty for doing business without a license, and to charge a fee of not exceeding five dollars ($5) for issuing each license.
 "(3) To require sworn statements as to the amount of capital invested, value of goods or stocks, or amounts of sales or receipts where the amount of the license is made to depend upon the amount of capital invested, value of goods or stocks, or amount of sales or receipts and to punish any person or corporation for failure or refusal to furnish sworn statements or for giving of false statements in relation thereto.
 "(b) The license authorized by subsection (a) of this section as to persons, firms, or corporations engaged in business in connection with interstate commerce shall be confined to that portion within the limits of the state and where the person, firm, or corporation has an office or transacts business in the city or town imposing the license.
 "(c) The power to license conferred by this division may be used in the exercise of the police power as well as for the purpose of raising revenue, or both."
In Estes v. City of Gadsden, 266 Ala. 166, 94 So.2d 744 (1957), this Court noted:
 "In the case of Smalley v. City of Oneonta, 253 Ala. 663, 46 So.2d 201, 203 [(1950)], in dealing with a privilege license of bricklayers within the city, this court said:
 "`The State may delegate its power to municipal corporations to license occupations within the limits of the city coextensive with the power of the State to do so and this power is limited only by the due process and equal protection provisions of the constitution. . . . The due process provision would prevent a license tax either for revenue or regulation to be confiscatory. Equal protection is satisfied when all persons of the same class fairly made are subject to the same amount and terms of such tax law. . . .
 "`This power to license which the State has and which it has conferred upon cities is not for the purpose of extending a privilege to one to engage in a business in which he does not have the absolute right to do so without such permit. Because the employment is for lawful gain and is a natural and inherent right does not exempt it from being a taxable event. "But natural rights, so called, are as much subject to taxation as rights of less importance. An excise is not limited to vocations or activities that may be prohibited altogether. It is not limited to those that are the outcome of a franchise. It extends to vocations or activities pursued as of common right. What the individual does in the operation of a business is amenable to *Page 589 
taxation just as much as what he owns, at all events if the classification is not tyrannical or arbitrary. `Business is as legitimate an object of the taxing power as property.'". . . .'"
266 Ala. at 170-71, 94 So.2d at 748. However, the Scotts do argue that the ordinances are unconstitutionally vague and overbroad and that they therefore violate the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, § 6, of the Alabama Constitution of 1901.
II. The Scotts' Vagueness Argument
The Scotts argue that the ordinances are unconstitutionally vague, i.e., that they violate their rights to due process under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, § 6, of the Alabama Constitution, because (1) the ordinances fail to define the circumstances under which a person will be considered to be "engaged in the business of . . . leasing" under Ordinance No. 959, or "engaged in leasing," under the ordinances at issue here, and (2) Ordinances No. 1178, No. 1188, No. 1293, and No. 1330 fail to make clear how property owners are to compute "gross annual receipts."
Federal caselaw provides that "[a] statute is vague if it fails to afford a `person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" Bama TomatoCo. v. United States Dep't of Agriculture, 112 F.3d 1542, 1547 (1997) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). Thus, "[v]ague laws are objectionable as transgressions of due process guarantees on two grounds: (1) they fail to provide fair warning to citizens charged with their observance, and (2) by failing to provide clear guidelines, they lend themselves to arbitrary applications by those charged with their enforcement." Bama Tomato, 112 F.3d at 1547 (quotingFamilias Unidas v. Briscoe, 619 F.2d 391, 399 n. 8 (5th Cir. 1980).
We consider the ordinances by applying those tests in connection with the following additional principles established by Alabama caselaw: "It is, without question, a settled rule of law in Alabama that: `municipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable.'" Hall v. City of Tuscaloosa, 421 So.2d 1244, 1247 (Ala. 1982) (quoting Cudd v. City of Homewood, 284 Ala. 268, 270, 224 So.2d 625,627 (1969)). "Mere difficulty of ascertaining its meaning or the fact that it is susceptible of different interpretations will not render a statute or ordinance too vague or uncertain to be enforced." City ofBirmingham v. Samford, 274 Ala. 367, 372, 149 So.2d 271, 275 (1963).
 A. Construction of Phrases "Engaged in the business of leasing" and "Engaged in Leasing"
This Court has stated that "[c]ity ordinances are subject to the same general rules of construction, as are acts of the Legislature." Ex parteCity of Orange Beach Bd. of Adjustment, [Ms. 1000645, Dec. 14, 2001]833 So.2d 51 (Ala. 2001). We further stated in Orange Beach:
 "In John Deere Co. v. Gamble, 523 So.2d 95, 99-100
(Ala. 1988), this Court, quoting Clark v. Houston County Comm'n, 507 So.2d 902, 903-04 (Ala. 1987), set out the following general rules of statutory construction, which also apply to the construction of municipal ordinances:
 "`The fundamental rule of statutory construction is to ascertain and give *Page 590 
effect to the intent of the [city council] in enacting the [ordinance]. Advertiser Co. v. Hobbie, 474 So.2d 93 (Ala. 1985); League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). If possible, the intent of the [city council] should be gathered from the language of the [ordinance] itself. Advertiser Co. v. Hobbie, supra; Morgan County Board of Education v. Alabama Public School College Authority, 362 So.2d 850 (Ala. 1978). If the [ordinance] is ambiguous or uncertain, the court may consider conditions which might arise under the provisions of the [ordinance] and examine results that will flow from giving the language in question one particular meaning rather than another. Studdard v. South Central Bell Telephone Co., 356 So.2d 139 (Ala. 1978); League of Women Voters v. Renfro, supra.'
 "In Ex parte Dorough, 773 So.2d 1001, 1003 (Ala. 2000) (citing Ex parte Pfizer, Inc., 746 So.2d 960, 964 (Ala. 1999)), this Court stated:
 "`"`When the language of a statute is plain and unambiguous, . . . courts must enforce the statute as written by giving the words of the statute their ordinary plain meaning — they must interpret that language to mean exactly what it says and thus give effect to the apparent intent of the Legislature.' . . .
 "`"`In determining the meaning of a statute, this Court looks to the plain meaning of the words as written by the legislature. As we have said:
 "'"'"'Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'"'"'"
833 So.2d at 55-56. Further, "it is established that taxing statutes should be strictly construed against the taxing power. State v. SealsPiano Co., 209 Ala. 93, 95 So. 451 (1923). Where the language of a taxing statute is reasonably capable of two constructions, the interpretation most favorable to the taxpayer must be adopted. Williams v. Pugh,24 Ala. App. 57, 129 So. 792 (1930)." Alabama Farm Bureau Mut. Cas. Ins.Co. v. City of Hartselle, 460 So.2d 1219, 1223 (Ala. 1984). "The rule that tax statutes are to be construed in favor of taxpayers and strictly against the taxing power applies to municipal corporations and municipal taxing ordinances." City of Mobile v. GSF Props., Inc., 531 So.2d 833,837 (Ala. 1988) (citing Al Means, Inc. v. City of Montgomery, 268 Ala. 31,36, 104 So.2d 816 (1958); State ex rel. Woodruff v. Centanne, 265 Ala. 35,38, 89 So.2d 570 (1956)). "Consistent with the rules governing construction of a tax statute, Alabama courts have refused to expand the language and scope of a tax statute." City of Mobile, 531 So.2d at 837 (citing Misener Marine Constr., Inc. v. Eagerton, 423 So.2d 161, 163
(Ala. 1982)).
Although the Scotts argue that the City has failed to define "leasing" in the ordinances, we note that the Scotts assert in their initial and reply briefs to this Court that leasing involves more than mere ownership of property and an execution of a lease. A "lease" is defined as "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration, usu[ally] rent." Black's Law Dictionary 898 (7th ed. 1999). The word "leasing" means the act of granting a lease. In the context of the ordinances, *Page 591 
we conclude that "leasing" means conveying the right to use and to occupy property in exchange for consideration during the applicable period each ordinance was effective.
The word "engage" is defined as "[t]o employ or involve oneself; to take part in; to embark on." Black's Law Dictionary 549 (7th ed. 1999). "Engaged" means to engage, and is used in the present tense. Therefore, in the context of the ordinances, we conclude that "engaged" means to engage during the period enumerated by each individual ordinance.
The Scotts contend that Alabama courts have, on occasion, construed the term "engage in business" to mean "employment which occupies the time, attention and labor of the person so engaged in business. That which a man occasionally engages in, as opportunity offers, or inclination prompts, is, for the time being his business; yet the law uses that term to indicate a regular and legal employment, not one that is occasional, irregular, or illegal." Rowe v. State, 19 Ala. App. 602, 603, 99 So. 748,749 (1924); see also Jones v. State, 25 Ala. App. 410, 149 So. 855
(1933). In Rowe, the court continued and stated, in pertinent part:
 "`Single acts are not licensed, but only a series of acts prosecuted with the intention of reaping a profit or making a livelihood.' [Harris v. State, 50 Ala. 127 (1874)].
 "See also [Weil v. State, 52 Ala. 19 (1875)]. Doing a single act, pertaining to a particular business, will not be considered, as has been held, engaging in or carrying on the business, yet a series of such acts would be so considered. Lemons v. State, 50 Ala. 130
[(1874)]; [McPherson v. State, 54 Ala. 221, 224
(1875)].
 "A single act, however, may be sufficient to constitute an `engaging in or carrying on the business' according to the intent with which the act is done, and all other proof in the case. If a person makes all necessary preparations to carry on a business, holds himself out for the business, intending to continue therein, he is engaged in or carrying on the business within the meaning of the law. Abel v. State, 90 Ala. [631,] 633, 8 So. 760 [(1891)]; Morningstar v. State, 135 Ala. 66, 33 So. 485
[(1903)]."
Rowe, 19 Ala. App. at 603, 99 So. at 749.
In Weil v. State, 52 Ala. 19 (1875), this Court examined whether a defendant was "engaged in the business" of "vending spirituous liquors" for purposes of paying a license fee. In stating the core question of such an inquiry, this Court quoted Harris v. State, 50 Ala. 127, 129
(1874):
 "`Has that business been engaged in, and pursued by the defendant for a profit, or as a means of livelihood? If it has, he should have obtained a license, and failing to do so, is a violator of the law. It is not necessary that it should be the sole or exclusive business or occupation. It may be pursued while pursuing another business, or in connection with another, and in either case the party would be punishable. It is true, the doing a single act pertaining to a particular business will not be considered engaging in, or carrying on the business, yet a series of such acts would be so considered. The true inquiry is, and one which a jury will seldom fail correctly to solve, what was the intent of the party? Was it to derive a profit, or the means of livelihood from retailing, or from any of the other occupations mentioned in the statute? If it was, he is guilty; if it was not, he should not be convicted.' Whether actual profit is derived from the acts imputed to the defendant, and which are supposed to be *Page 592 
evidence of his having engaged in, or carried on a business, is not a material inquiry. There is no business which may not be so conducted as not to yield a profit. The inquiry is, was it the purpose to derive profit?"
52 Ala. at 21. See also Owens v. Grant, 569 So.2d 707 (Ala. 1990) (citingWeil for guidance in interpreting the term "profit-motivated" in a statute). We also note, as did the trial court, that for purposes of state taxation in the sales and use tax context, "business" is defined as "[a]ll activities engaged in, or caused to be engaged in, with the object of gain, profit, benefit, or advantage, either direct or indirect . . . ." § 40-23-1(a)(12), Ala. Code 1975 (emphasis added). Thus, we conclude that the phrase contained in Ordinances No. 959, No. 1178, and No. 1188 — "engaged in the business of leasing" — requires an act or acts of leasing, accompanied by the intent to derive a gain, profit, benefit, or advantage from such action or actions.
The revisions made to the ordinances, beginning with Ordinance No. 1293, which amended Ordinance No. 1178 and substituted the phrase "engaged in leasing" for the phrase "engaged in the business of leasing," support a conclusion that the phrase "engaged in leasing" is intended to be somewhat broader than "engaged in the business of leasing." We recognize that each ordinance before, after, and including Ordinance No. 1293, contained or incorporated a clause substantially similar to the following, taken in pertinent part from Ordinance No. 1341:
"Section 3. License Schedule
 "The following schedule of licenses is hereby fixed and imposed for and upon the businesses, occupations, professions, trades and vocations which may be engaged in or conducted in the City for the year beginning January 1, 1995 and for each year thereafter (sometimes hereinafter referred to, individually, as `business' and, collectively, as `businesses') and every person engaged in any of the businesses enumerated or referred to in this ordinance after December 31, 1994 shall pay for and take out such license as required by this ordinance, and such licenses, until repealed or modified, shall be in such amounts as are hereinafter provided."
This sentence in the ordinances acts as a "catchall" to encompass the "engaged in" language; as a consequence, the City may require a license for the privilege of being engaged in "the businesses, occupations, professions, trades and vocations" involved in leasing.
We conclude that, by changing the requirement for the license in Ordinance No. 1293 and those ordinances subsequent to it from "engaged in the business of leasing" to "engaged in leasing," and by separating leasing into two components — dwellings and nondwellings — the City intended to require licenses from all those leasing premises other than dwellings, if the leasing activity fell within the grant of the power given to the City by § 11-51-90, Ala. Code 1975. Because the ordinances require a license for engaging in the business of leasing and in "businesses, occupations, professions, trades and vocations," we conclude that the terms "engaged in the business of leasing" and "engaged in leasing" are not unconstitutionally vague.
 B. Calculation of "Gross Receipts"
To determine whether a means for calculating the business license tax exists, we look to the ordinances. The ordinances do not use the term "gross annual receipts," as the Scotts state, in determining the amount owed for the license tax, but instead use the term "gross receipts." Ordinance No. 1178 provides a definition of, and a method to compute, gross receipts. *Page 593 
Ordinance No. 1178, Section 9.(a), provides:
 "SECTION 9.(a) Definition of `receipts' and `sales.' Where the amount of the license tax is based upon receipts, including gross receipts, or sales, in the absence of any other specific provision therefor, the receipts and sales referred to are those of such business for the year next preceding the year for which the license is being obtained; provided, however, that if such business did not operate during the entire preceding year, the license tax shall be based upon the amount which bears the same relation to the amount of receipts or sales during the preceding year as the entire year bears to the portion of the preceding year during which such business operated. If the operation of a business commences after the first day of any year, a license shall be issued for the minimum license tax required for such classification, or the sum of $200.00 if no minimum license tax is required for such classifications, and, three months after the commencement of the operation of such business a license tax for the partial year during which the business was started shall be payable, the amount of which shall be computed in the manner set out in the preceding sentence, except that the gross receipts or gross sales shall be those of the business for such three-month period."
Section 9.(b) of Ordinance No. 1178 explains that gross receipts "mean the entire receipts of the business, occupation, profession or trade engaged in, including all receipts from sales . . . ." Because Ordinance No. 1178 explains how gross receipts are calculated and what is meant by that term, Ordinance No. 1178 is not unconstitutionally vague.
Regarding the other individual ordinances complained of by the Scotts, we note that (1) Ordinance No. 1188 amended Section 3.6.D of Ordinance No. 1178, but did not change or repeal Sections 9.(a) or 9.(b); (2) Ordinance No. 1293 amends Section 3.6.D of Ordinance No. 1178 and also provides specifically for the time periods, i.e., "calendar year," to be used when calculating gross receipts; and (3) Ordinance No. 1330 amends Ordinance No. 1178, and defines "gross receipts" and "gross commissions," both of which are based on receipts collected during the preceding calendar year. Thus, we conclude that the term "gross receipts" as used in the remaining ordinances is not unconstitutionally vague.
Although the Scotts also allege that because the ordinances fail "to provide clear guidelines for their applications, the ordinances lend themselves to arbitrary applications by those charged with their enforcement" (Scotts' brief, at 25), our conclusion removes any need to examine this argument further. Moreover, the record contains no evidence tending to show that the ordinances were enforced arbitrarily. We next consider the Scotts' argument that the ordinances violate the overbreadth doctrine.
III. The Scotts' Overbreadth Argument
This Court stated the following in Butler v. Alabama Judicial InquiryCommission, 802 So.2d 207 (Ala. 2001), concerning the concept of overbreadth:
 "`An overbreadth challenge is based on the statute's "possible direct and indirect burdens on speech."' United States v. Acheson, 195 F.3d 645, 650 (11th Cir. 1999) (quoting American Booksellers v. Webb, 919 F.2d 1493, 1499-500 (11th Cir. 1990)). The overbreadth doctrine `permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly *Page 594 
legitimate sweep.' City of Chicago v. Morales, 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 612-15, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). The doctrine '"protects the public from the chilling effect such a statute has on protected speech; the court will strike down the statute even though in the case before the court the governmental entity enforced the statute against those engaged in unprotected activities."' Acheson, 195 F.3d at 650 (quoting Nationalist Movement v. City of Cumming, 934 F.2d 1482, 1485 (11th Cir. 1991) (Tjoflat, J., dissenting))."
802 So.2d at 213. However, in Friday v. Ethanol Corporation, 539 So.2d 208
(Ala. 1988), this Court recognized a broader application of the overbreadth doctrine by stating, in pertinent part:
 "The doctrine of overbreadth recognizes that a state legislature may have a legitimate and substantial interest in regulating particular behavior, but `that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) [quoting Zwickler v. Koota, 389 U.S. 241 (1967)]. Historically, the overbreadth doctrine has been used by the federal courts to prevent a chilling effect on First Amendment freedoms. Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 852 (1970). The overbreadth doctrine does not apply to commercial speech under the Federal Constitution. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). However, the overbreadth doctrine under the Alabama Constitution has been applied in due process cases not involving First Amendment freedoms. See Ross Neely Express, Inc. v. Alabama Department of Environmental Management, 437 So.2d 82 (Ala. 1983)."
539 So.2d at 215. In Ross Neely Express, Inc. v. Alabama Department ofEnvironmental Management, 437 So.2d 82 (Ala. 1983), this Court stated:
 "Statutes and regulations are void for overbreadth if their object is achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms. See Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629
(1967)."
437 So.2d at 85.
 "This Court has also recognized that the right to due process under the Alabama Constitution is violated when a statute, regulation, or ordinance imposes restrictions that are unnecessary and unreasonable upon the pursuit of useful activities in that they do not bear some substantial relation to the public health, safety, or morals, or to the general welfare, the public convenience, or to the general prosperity."
Friday v. Ethanol Corp., 539 So.2d at 216 (citing Ross Neely Express,Inc., 437 So.2d at 84-86; City of Russellville v. Vulcan Materials Co.,382 So.2d 525, 527-28 (Ala. 1980); Leary v. Adams, 226 Ala. 472, 474,147 So. 391 (1933); Baldwin County Bd. of Health v. Baldwin County Elec.Membership Corp., 355 So.2d 708 (Ala. 1978)).
"`The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary.'" Members of City Council of Los Angeles v. Taxpayers forVincent, 466 U.S. 789, 805 (1984) (quoting Berman v. Parker, 348 U.S. 26,33 *Page 595 
(1954)). If an ordinance is "`fairly debatable, a court will not substitute its judgment for that of the municipal government body acting in a legislative capacity.'" City of Russellville v. Vulcan MaterialsCo., 382 So.2d at 526 (quoting City of Birmingham v. Norris, 374 So.2d 854,856 (Ala. 1979). The ordinances at issue here can reasonably be said to have been designed with the purpose of providing for the general welfare and prosperity of the City's residents. Because the Scotts have not shown that the ordinances impose an unnecessary and unreasonable burden upon useful activity and because the Scotts have presented no evidence indicating that the City's actions were unreasonable, arbitrary, or capricious in this regard, the Scotts' overbreadth argument fails.
IV. The Scotts' Behavior Did Not Constitute Passive Ownership
We now consider the Scotts' argument that the ordinances, as written, do not apply to them because their ownership of the commercial real property was "passive." The Scotts contend that they neither "engaged in leasing" nor were "engaged in the business of leasing," as contemplated in the ordinances. The Scotts' arguments can also be fairly interpreted as asserting that they did not sufficiently "engage in" leasing to satisfy the license requirement. Indeed, the Scotts argue that their "passive ownership" of the real property does not constitute a "business" at all for purposes of the license tax imposed by the ordinances.
In the context of the application of an insurance contract to a "business," this Court has endorsed a definition of "business" as "'"[b]usiness" in its broad sense embraces anything about which a person may be busy, and in its usual sense, signifies an undertaking or calling for gain, profit, advantage or livelihood.'" Vallas v. Cincinnati Ins.Co., 624 So.2d 568 (Ala. 1993) (quoting Stanley v. American Fire Cas.Co., 361 So.2d 1030, 1033 (Ala. 1978)). In Vallas, the plaintiffs argued that their activities did not constitute "business" or a "business pursuit" under exclusions present in the plaintiffs' homeowner's insurance policies. Although, "[t]his Court, like most, if not all, others, has consistently held that `exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage for the insured,'" Guaranty Nat'l Ins. Co. v. Marshall County Bd. of Educ.,540 So.2d 745, 748 (Ala. 1989) (quoting Employers Ins. Co. of Alabama,Inc. v. Jeff Gin Co., 378 So.2d 693 (Ala. 1979)), this Court nevertheless held in Vallas that the plaintiff's self-defined "passive investment" was a "business pursuit." In doing so, this Court stated:
 "Considering the [Cincinnati Insurance Company] policy first, we cannot say that the limited partnership, which was formed to buy and sell investment real property for capital gain, was not `an undertaking . . . for gain [or] profit.' Likewise, we cannot say that the limited partnership was not a `business pursuit.' Although the plaintiffs argue that the limited partnership activity was essentially a passive, real estate investment and that the term `business' signifies only an active business with an office, employees, equipment, etc., we think the term has a much broader meaning than they would admit."
624 So.2d at 571.
The record before us shows that the Scotts intended to derive profit, benefit, or monetary gain from the leasing of their properties. Pursuant to the Scotts' completely normal and legitimate desire to derive such a profit, or monetary gain, and *Page 596 
apparently from their desire not to manage every aspect of such an enterprise, the Scotts hired agents to assist in the management and leasing of most of their properties. The fact that the Scotts sought to limit their work in leasing some of their properties, does not mean that they did not engage in such activities at all. The record reveals that even limited activities such as signing a lease, approving a tenant, setting rental rates, or transferring an interest in the property would necessarily take both time and effort on the part of the Scotts. Thus, we conclude that the real properties were not "passive investments" as the Scotts assert, but rather, required the time, attention, and labor of the Scotts.
We reach this conclusion because the Scotts were required to sign leases and to make related decisions regarding those leases, such as accepting or rejecting tenants, setting rental rates, or selecting agents to act on their behalf regarding the leasing of the real property for commercial purposes. Because the word "business" is omitted from the ordinances beginning with Ordinance No. 1293, as to leasing by owner-lessors, those revised ordinances contemplate that one could engage in leasing without the intent to make a profit. Accordingly, we conclude that the Scotts were engaged in the business of leasing or were engaged in leasing, as stated by the ordinances in effect at the times in question and that they thus were not mere "passive investors" for purposes of the applicable ordinances at issue before us.
 V. Double Taxation
The Scotts further argue that Ordinances No. 1178, No. 1188, No. 1293, and No. 1330 effectively imposed double taxation because they "required individuals engaged in leasing as well as leasing agents to pay a business license tax." (Scotts' brief, at 27.) The Scotts claim that the ordinances mentioned above "do not exempt amounts paid by property owners in commissions to leasing agents from the calculation of gross annual receipts. This results in the property owners and the leasing agents paying a business license tax on the same revenue." (Scotts' brief, at 27.)
This Court has stated that, "[a]lthough it is the general rule in this state that double taxation will be avoided, if possible, such taxation is permissible and not unconstitutional unless such double taxation is confiscatory, discriminatory, or results in an unreasonable pyramiding of taxes." Starlite Lanes, Inc. v. Alabama, 283 Ala. 48, 51, 214 So.2d 324,326 (1968) (citing Ray E. Loper Lumber Co. v. State, 269 Ala. 425,113 So.2d 686 (1959); Al Means, Inc. v. City of Montgomery, 268 Ala. 31,104 So.2d 816 (1958); Woco Pep Co. of Montgomery v. City of Montgomery,219 Ala. 73, 121 So. 64 (1929); Brown Plumbing Heating Co. v.McDowell, 240 Ala. 485, 200 So. 104 (1941)).
The ordinances do not impose a tax on the mere ownership of real property. Instead, as pertains to the Scotts, they levy a tax for the privilege of engaging in the leasing of property located in the City, whether it be by reason of business, occupation, profession, trade, or vocation. Moreover, as this Court stated in Starlite: "Although there is double taxation in the sense that two taxes have been paid on the same item [gross receipts], the two taxes do not fall upon the same person. We do not feel that this is objectionable in the present case."283 Ala at 52, 214 So.2d at 327. Although certain of the ordinances do require a tax on the gross receipts earned by the Scotts and on the gross commissions of their agents, which under the circumstances in this case, are based on a percentage of the Scotts' gross receipts, this is not the equivalent of a *Page 597 
double tax on the gross receipts received by the Scotts. The Scotts hired agents to manage their properties and to conduct some of their affairs, and in so doing, their agents became subject to the ordinances. Moreover, as in Starlite, the tax is borne by different taxpayers. Thus, we are unable to say that the taxes imposed by the ordinances result in unreasonable taxation. Accordingly, we conclude that the Scotts' argument that the selected ordinances might impose double taxation does not provide this Court with any basis on which to invalidate the ordinances.
The Scotts also argue that the penalties imposed by the ordinances for failure to pay the license tax are unreasonable and excessive, and that because Ordinance No. 1178 was in effect on January 1, 1995, they are exempt from the taxes imposed by that ordinance for that year, because, they say, they possessed no "office or other place of business in the City, as required by the Ordinance." However, the Scotts failed to raise these issues before they filed their postjudgment motion objecting to the entry of the judgment. In City of Tallassee v. Harris, 431 So.2d 1177
(Ala. 1983), this Court noted that postjudgment motions are not the proper vehicle for raising new issues. In Harris, this Court stated, in pertinent part:
 "The city further contends that the trial court erred in denying its motion for judgment N.O.V. or in the alternative for a new trial on this issue. The city did not raise the issue of contributory negligence in its motion for directed verdict; therefore, it cannot be repostured in a post-trial motion for judgment N.O.V. or in the alternative a new trial. Rule 50(b), [Ala.R.Civ.P.]; Housing Authority [of Prichard] v. Malloy, 341 So.2d 708, 709-710 (Ala. 1977). Consequently, the trial court cannot be placed in error for denying the city's motion for directed verdict on the basis of issues not presented in its motion."
431 So.2d at 1182. See also Hall v. Hall, 421 So.2d 1270 (Ala.Civ.App. 1982) (party, who has knowledge of facts, cannot normally withhold from the court his objections based on such information and thereby gamble upon the final result of the litigation and, upon an adverse judgment, successfully raise such an issue for the first time through a postjudgment motion); Burton v. Burton, 379 So.2d 617 (Ala.Civ.App. 1980) (party may not even raise the issue of the constitutionality of statute for the first time in a motion for a new trial or on appeal). Accordingly, we do not address this issue further.
For the reasons we have previously discussed, the judgment of the trial court is due to be affirmed.
AFFIRMED.
See, Brown, and Stuart, JJ., concur.
Moore, C.J., concurs in the result.
[1] Mrs. Scott died before the trial court rendered its judgment; her estate was substituted as a party.
[2] Sarah Heard Allred, Virgil Heard, and Jefferson Properties were the general partners in Crestline Center Partnership.
[3] The record shows that this trust was created on behalf of Sarah Heard Allred.
[4] Jefferson Properties, Ltd., is a limited partnership with Andrew Scott and Barbara Ann Scott serving as partners.
[5] The record does not show that the trial court ruled on the motion for an extension of time; however, it did allow the parties to continue to submit motions.
[6] However, the trial court held that in regard to the Crestline Center Partnership "the three general partners, Sara Heard Allred, Virgil Heard, and Jefferson Properties, Ltd., are jointly and severally liable with the partnership for the amount due."
[7] As provided in Ordinance No. 959.
[8] As provided in all of the ordinances previously mentioned, except Ordinance No. 959.